**GREAT NORTHERN RAILWAY COMPANY**

v.

**The UNITED STATES.**

No. 183–58.

United States Court of Claims.

March 7, 1962.

Elmer B. Trousdale, St. Paul, Minn., for plaintiff.

Lewis A. Dille, Kensington, Md., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

REED, Justice (Retired), sitting by designation.

In the year 1944 the plaintiff and its connecting carriers transported quantities of fuel oil distillate for the United States from Baytown, Texas, to Edmonds and Richmond Beach, two points of destination within the State of Washington. In all there were 206 shipments of this commodity; 177 went directly from Baytown to their ultimate destination, and 29 others were originally consigned to Seattle, Washington, of which all but one [1] were reconsigned from there to either Edmonds or Richmond Beach. The plaintiff was originally paid the sums which it requested for this transit under the provisions of 49 U.S.C. § 66, which allows for payment of amounts claimed subject to recoupment. After audit the disputed sums were recouped by the Government from other amounts due the carrier or were refunded under protest. The carrier seeks to recover these monies.

Necessary to a decision of this case is an understanding of existing rate structures in so far as applicable to the routes in question.

█ *The 178 Shipments.* Plaintiff contends that, as the delivering carrier, it was entitled to collect on the basis of the amounts provided in the applicable land-grant equalization agreement. At the time there was a joint single factor through tariff [2] on file with the Interstate Commerce Commission which provided a rate of $1.45 per hundred pounds from Baytown to the points of destina-

---

1. The other shipment was diverted at Hillyard, Washington, to Richmond Beach before it reached Seattle. The charge on that shipment must be computed as if it had been one of the 177 shipments which went directly to Edmonds or Richmond Beach since plaintiff's reconsignment tariff provided in pertinent part that "if a car is diverted * * * the through rate * * * will be applied from original shipping point to final destination which would apply in the absence of the out-of-line service [if there are no back-haul charges] * * *." The arguments which apply to reduce the charge on the 28 shipments are not apposite to this single shipment since it never actually went to Seattle. See infra.

2. Such a rate is arrived at by the concurrence of a number of connecting carriers which jointly serve a particular route.

tion over the route of actual movement. This was, of course, available to the Government and private shippers alike. Beginning in 1850 the United States had entered into a number of agreements with various railroads whereby, in return for a deed to the right-of-way, the railroads accorded the Government certain reduced rates for carriage over this mileage. As a consequence the more circuitous route over the land-grant mileage often proved for the Government to be the cheapest.[3] For the purpose of competing for this traffic the railroads operating the more direct route would often agree to supply that service at no more than the Government would have to pay for land-grant mileage transportation. Popularly, it would enter into a "land-grant equalization agreement." In the present case a land-grant mileage route did exist, and the non-land-grant direct carriers had entered into a land-grant equalization agreement. It is on the basis of the reduced rate provided in that agreement (60.61% of $1.465, the lowest combination rate for the land-grant mileage, or about 88.8¢ per hundred pounds) that plaintiff contends the charge should be computed.

 Unlike a private party, the United States may contract with the rail carriers for transportation of goods "at reduced rates." 49 U.S.C. § 22. The land-grant equalization agreement was authorized by this section, but that section is utilized in many other situations as well. Thus, the carriers need not as a general rule abide by their published tariffs in dealing with the United States. Since such deviations are authorized by § 22 of the Interstate Commerce Act, such a rate is said to be the product of a "section 22 agreement" or to be a "quotation rate." We use these terms in contradistinction to a rate based on a land-grant equalization agreement. In the year 1944 there was in existence Quo-

tation 193A which provided a § 22 rate to the Government of 75¢ per hundred pounds for fuel oil from Baytown to Seattle, Washington. No § 22 quotation provided a rate for transit from Baytown to the ultimate destinations nor from Seattle to the ultimate destinations. There was, however, a tariff on file with the Commission which provided a rate of 4.5¢ per hunderd pounds for all shippers from Seattle to the ultimate destinations. The United States maintains that it is entitled to combine the § 22 Baytown-Seattle rate with the Seattle-Edmonds (and Richmond Beach) tariff rate. This would produce a total rate of 79.5¢.

As a general rule, if a through rate is in existence, the shipper may not combine the intermediate rates; the through tariff is the only lawfully applicable rate. Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189. On the other hand, if a § 22 quotation rate reveals an intention that it may be so used, it may be combined with another quotation rate to produce an aggregate rate lower than the through tariff rate. Cf. Union Pacific R. Co. v. United States, 287 F.2d 593 (Ct. Cl.). And perhaps, since the Government may receive preferences, a quotation rate may also be combined with a local tariff if the quotation is designed to be used in that manner. However, for obvious reasons[4] the parties have stipulated[5] that this case will turn upon another issue— whether the Government may avail itself of the following provision in the Baytown-Edmonds and Richmond Beach through tariff and aggregate the rates as it desires.

"If the aggregate of separately established (joint, local and/or proportional) rates applicable on Interstate traffic contained in tariffs *lawfully on file with the Interstate Commerce Commission* applicable via any route over which the through

3. By 1946 all of these land-grant deductions were eliminated. 59 Stat. 606, 49 U.S.C. § 65.

4. Seattle was not an intermediate point over the route of actual movement. See

infra. And the Commissioner specifically found that the plaintiff did not contemplate such use of the quotation. Finding No. 13.

5. See Finding No. 17

rates published in this tariff apply, produces a lower charge on any shipment than the rate published herein, such aggregate of rates will apply via all routes * * * over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment." (Emphasis supplied) Finding No. 8(a).

Seattle was not an intermediate point between Baytown and Edmonds and Richmond Beach over the route of actual movement. Nevertheless the above tariff rule upon which the defendant relies required the aggregation of rates if the "separately established * * * [rates] applicable via any route over which the through rates published by this tariff apply, produce[d] a lower charge. * *" Seattle was an intermediate point between origin and destination via the Stockton-Bieber route, another route to which this tariff applied. The plaintiff appears to admit that the § 22 Quotation 193A rate also applied to shipments to Seattle by way of the Stockton-Bieber route. In construing the aggregation rule, therefore, we may treat this case as if Seattle had in fact been an intermediate point on the route of actual movement.

Although some § 22 quotations were actually filed with the I.C.C., as the Commissioner found, Quotation 193A was not. Thus the aggregate rule at least does not permit use of this particular quotation in combination with the local tariff. The mere fact that item No. 4 of Quotation 193A provided that shipments made thereunder would be "subject * * * to all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment, * * *" does not indicate that it was to be considered a rate on file with the Interstate Commerce Commission within the meaning of the aggregate rule of the through tariff. The aggregate rule, as included in the quotation, only applied to permit the aggregate of intermediate rates between Baytown and Seattle. This the United States is not attempting to do.

Nor would the fact that § 4 of the Interstate Commerce Act [6] may have a broader scope than the aggregate of intermediate rates rule contained in the tariff require a different result.[7] It provides in pertinent part that:

"It shall be unlawful for any common carrier subject to this chapter * * * to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this chapter * * *."

It is well established that the mere fact that a published rate is violative of § 4 does not give the shipper the right to apply the "legal" rate. Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762; Swift & Co. v. Alton R. Co., 268 I.C.C. 103, 106. Only if the rate is "unreasonable" has the shipper established that an overcharge has occurred. Birmingham Traffic Bureau v. Director General, 115 I.C.C. 33; Virginia-Carolina Chemical Co. v. Atlantic Coast Line R. Co., 78 I.C.C. 107. And, it is, of course, not within our competence to determine such a question. See United States v. Western P. R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Davis v. Krauss Bros. Lumber Co., 25 F.2d 888 (D.C.E.D.La.1928). Since the Govern-

6. 49 U.S.C. § 4.

7. While the quotation may not be on file with the Commission, arguably it is a rate "subject to the provisions of [Chapter 1, Title 49 U.S.C.] * * *" with-in the meaning of the aggregation rule of § 4. Furthermore, carriage to Seattle was for a longer distance than carriage to Edmonds or Richmond Beach; thus, the long-haul short-haul prohibition may also apply.

ment may not aggregate the quotation and tariff rates as it desires, the land-grant equalization agreement rates apply to these shipments.

■ *The 28 Shipments.* The 28 shipments moved through Richmond Beach and Edmonds to Seattle; upon reconsignment they were back-hauled from Seattle to their ultimate destinations. Both parties agree that this charge is to be computed in accordance with Rule 14 of plaintiff's reconsignment tariff. It provides in pertinent part:

"(a) Before placement.—If a car is diverted or reconsigned before placement for unloading, the through rate (Rule 2 in Item No. 30) will be applied from original shipping point to final destination which would apply in the absence of the out-of-line service, plus the applicable rates (or back-haul rates if any), to cover the back-haul service in each direction, * * * *but not in excess of the full combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment.* * * * *"* (Emphasis supplied) Finding No. 11.

In other words, the through rate from origin to final destination (plus back haulage) is to be applied unless the combination of the origin-reconsignment point rate and the reconsignment point-destination rate produces a lower charge. Obviously the literal language of this rule precludes combination of the quotation rate with the back-haul route local tariff to compute the maximum charge since the quotation is not a "tariff." However, we must remember that these shipments originally moved under Quotation 193A since they were shipped to Seattle. We cannot believe that, in the light of Item 4 of the quotation, it was the intention of the parties in a true case of reconsignment to compute the charge as if a through shipment had been involved. But compare Davis v. Krauss Bros. Lum-

ber Co., 25 F.2d 888 (D.C.E.D.La.1928). Item 4 of the quotation provided:

"In the absence of specific provisions to the contrary in this Quotation, *shipments made hereunder are subject to all charges and all allowances for or in respect of diversion, reconsignment,* demurrage, switching, *and to all other* privileges, charges and *rules which in any way increase or decrease the amount to be paid on any shipment,* or which increase or decrease the value of the service as provided in applicable tariffs on file with the Interstate Commerce Commission, or by Section 22 Quotations, without, in any case, any land-grant deduction." (Emphasis supplied). Finding No. 10.

Thus we should compute the charge using the quotation and we are to treat the case as if Rule 14 were included within the quotation; in so doing we should interpret that rule so that it serves the same function with regard to the quotation that it would serve with respect to an ordinary tariff on file with the Commission. The purpose of Rule 14 was to permit the aggregation of favorable rates in the case of reconsignment. We conclude, therefore, that in these circumstances the quotation is to be treated as a "tariff" for the purposes of Rule 14, and that the United States may combine the quotation rate and local tariff to produce the maximum charge on these 28 shipments.

Of course, if the United States originally had intended to reconsign, we would look to the through tariff rather than the quotation in computing the charges. Cf. Baltimore & O. S. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; Marshall Mfg. Co. v. Texas & P. R. Co., 29 F.2d 660 (C.A. 5).

As to the 28 shipments referred to above, the plaintiff is not entitled to recover. Plaintiff is entitled to recover as to the 178 shipments and judgment to that effect will be entered for the plain-

tiff with the amount of recovery to be determined pursuant to Rule 38(c).

It is so ordered.

JONES, Chief Judge, and DURFEE and LARAMORE, JJ., concur.