Durfee, Judge,
delivered the opinion of the court:
In this case plaintiff, a common carrier by railroad, seeks to recover $24,474.90 in demurrage charges from the Government for the detention of 569 rail carloads of ammunition -for cannon and other munitions during the period July 17, 1950, to October 14, 1950. These 569 Government-owned shipments moved under Government bills of lading from other states to Gold Bar, Washington, during the period in ■question.
Initially, the 569 shipments were consigned to the port of .'Mukilteo, Washington (located on the lines of plaintiff approximately 20 miles north of Seattle), and all 569 shipments were moved toward that port via southern routes ■through Bieber, California, Portland, Oregon, or Seattle, Washington. Upon arrival at Interbay, Washington (a substation of Seattle), the Government issued diversion orders ■changing the destination from Mukilteo to Gold Bar, Washington. At Gold Bar the 569 shipments were not unloaded ■but were held on plaintiff’s tracks for periods ranging from .several days to two weeks. At the end of this detention, the Government issued a second bill of lading requiring that the shipments be transported from Gold Bar back to Mukilteo, *228 Washington, or Lacoda, Oregon, where they were presumably transloaded onto vessels for overseas shipment.
Demurrage is defined for the purpose of this case as a carrier’s charge to the shipper for detention of a car beyond the free time published in tariffs for loading, unloading, diversion, reshipment, etc. Demurrage charges are governed by published tariffs and orders of the Interstate Commerce Commission.
Rule No. 2 of Jones Tariff 4-Z,. entitled “Free Time Allowed” provides:
Twenty-four hours’ (one day) free time will be allowed: 1. When cars are held for reconsignment, diversion or reshipment, or held in transit on orders of consignor, consignee or owner.
Plaintiff relies upon the above tariff provisions to establish its claim for demurrage after hours' free time, because the cars were held at Gold Bar for reshipment.
However, Item 10 of Tariff 4-Z contained a “General Exception” which provided:
The following cars are not subject- to Demurrage Rules and Charges, published in Section No. 1, pages 89 to 50, inclusive.
Sji
(b) At the ports on cars containing freight for-trans-shipment to or from vessels and at Brownsville, Eagle Pass, El Paso, Laredo and Presidio, Texas, on cars containing export traffic, when rules and charges applicable thereto are provided in the tariffs of the individual carriers lawfully on file with the Interstate Commerce Commission, except to the extent indicated in such tariffs. This exception also applies to such cars-when held in transit because they cannot reasonably be accommodated at the ports. [Emphasis supplied.]
Defendant contends that the shipments involved were “held in transit” at Gold Bar within the purview of this General Exception contained in 4-Z.
Defendant also relies upon North Pacific Coast Freight Bureau Local Freight Tariff 28-1 “Naming Demurrage-Charges and Free Time Allowance On Cars Held at North Coast Points of Interchange * * * For Delivery to Water Carriers,” which provides in part:
*229 Free Time’:
On Carload Freight Originating at Points in the United States * * * and Destined to Points in other foreign countries; * * * Free Time Allowed for Unloading 240 hours (10 days).
Note 1 of said Tariff 28-1 to which item 55 of that tariff was subject to provided:
Free time is to be computed from first 7:00 A.M. after notice of arrival, at fort * * * or of carriers’ readiness to deliver at fort, except on freight as mentioned in Note 3, on which free time is to be computed from first 7:00 A.M. after disposition order is received, without further notice of arrival. [Emphasis supplied J
At this point, careful scrutiny of the actual details of the billing and movement of the 569 shipments is essential. The parties have agreed upon 31 shipments as typical of all. The original intention of the Government was that all of these carload shipments of ammunition were destined for the port of Mukilteo, as evidenced by the original Bills of Lading. When the shipments reached the intermediate point of Inter-bay, they were diverted by Government order, stamped on the Bills of Lading, to Gold Bar.
Unlike Mukilteo, Gold Bar was not a port of the interchange of lading with water carriers, but was a separate railroad station 32.9 miles east and inland of Mukilteo. To reach Gold Bar from Interbay, the shipments moved north through Mukilteo to Everett, thence east to Gold Bar. The cars were diverted to Gold Bar because ammunition could not be held within the congested port area for over 24 hours, and because of congestion of port facilities at Mukilteo. Upon arrival plaintiff railroad promptly advised the Government of the day and hour of the arrival at Gold Bar. This notice served to set the “free time” period running under either Tariff 4r-Z or 28-1. The cars were not unloaded, but were set out on storage tracks and held for periods ranging from about one day to two weeks. No Government facilities for receipt or storage of ammunition were located at Gold Bar.
Subsequent to the detention of the cars at Gold Bar, a second bill of lading was issued by the Government for each *230 of the shipments from Gold Bar back to Mukilteo, except 12 cars to the port of Lacoda, Oregon.
Defendant treated the shipments as terminating at Gold Bar for the purpose of constructing the transportation rate for line haul service to Gold Bar and for the rate from Gold Bar to Mukilteo, although defendant knew that the ultimate destination was Mukilteo for trans-shipment at the port. In Memphis Merchants Exchange v. I.C.R.R., 43 ICC, 378, the Interstate Commerce Commission stated:
Manifestly the shipper * * * cannot treat the different stages or steps of the completed movement of the traffic as a single unit for some purposes, and as separable or local movements, in part for other purposes.
Note 3 to Rule 2 of Tariff 4-Z defines a reshipment as: “the making of a new contract by which under a new rate the entire original lading, without being unloaded, is forwarded in the same car to another destination.” The diversion order to Gold Bar and the second bill of lading from there to Mukilteo formed “a new contract, * * * under a new rate.” Under such circumstances, it would appear that the cars were not held at Gold Bar in transit to Mukilteo under Tariff 28-1, but were held for reshipment to Mukilteo under Rule 2 of Tariff 4-Z, which allows 24 hours’ free time when cars are held for reshipment. When the Government itself issued a second bill of lading for the movement from Gold Bar to Mukilteo under a new rate, it certainly determined that the cars were not in transit to Mukilteo when they were held at Gold Bar, within the meaning of the General Exception contained in Tariff 4-Z — Item 10 relied upon by defendant. Neither can it be said that the cars were held at Gold Bar within the provision of Tariff 28-1 which provides “Free Time Allowed for Unloading — 240 hours (10 days).” These shipments were not held at Gold Bar for unloading at Gold Bar; there were no facilities there for unloading.
Defendant’s position is that carriers’ notice to it of “readiness to deliver at the port” constitutes delivery; that since a constructively-placed car is not in an accessible place for unloading, as Gold Bar, a notice to the consignee of this constructive placement at Gold Bar constitutes notice of *231 carriers’ readiness to deliver at the port of Mukilteo, and commenced the running of the 10 days free time allowance .authorized by Tariff No. 28-I.
The carrier did not deliver a notice to the Government of “readiness to deliver at port,” or a “notice of arrival at port” as provided for the computation of free time under Tariff 28-1, Note No. 1, supra. The carrier served a notice of arrival at Gold Bar. Gold Bar was not a port, it was a separate station over 32 miles inland from the port. The shipper by its diversion order named Gold Bar as the destination of the shipments, and subsequently treated Gold Bar ns the origin of the shipments to Mukilteo in the new bills of lading and the transportation rate. There was no constructive delivery or placement of the cars at Mukilteo while they were held at Gold Bar.
We can find no applicable exception to the provisions of Jones Tariff 4-Z with 24 hours’ free time on assessment of demurrage and conclude that it governs in this case.
However, defendant also takes the position that negotiations between the parties during 1950 show that plaintiff agreed with defendant on 10 days’ free time allowance at Gold Bar; also that these negotiations constituted a special Section 22 Quotation applicable to this specific situation.
The substance of these negotiations is set forth in our Findings of Fact. About halfway between July and October 1950, the period over which these shipments were made, representatives of the Government and the railroad met on August 10, 1950 and discussed shipments of ammunition destined for Mukilteo and held at Gold Bar. The memorandum •of this meeting appeared to contemplate 10 days’ free time for holding at Gold Bar or Mukilteo, but concluded that the Railroad would consider this as providing for a request to be made in writing by the Government to the Railroad’s General Freight Traffic Manager. This request was submitted in letters from the Government dated August 17 and 18, 1950 to plaintiff, to which it replied on October 16, 1950. Although there was clear agreement that shipments to Muk-ilteo came under Tariff 28-1 with 10 days’ free time, there was no clear understanding as to shipments destined for 'Gold Bar, and subsequently reshipped to Mukilteo. In any *232 event, the final reply by the Railroad’s Traffic Manager was received by the Government after the movements of the shipments involved in this case and was not retroactive.
Following these negotiations, representatives of the parties met on November 14, 1950 to certify the demurrage bills for the shipments in suit. After this meeting, the Government transportation officers were satisfied that the demurrage was properly assessed on the basis of 24 hours’ free time on those shipments. For the most part, certification of the bills was then stamped on the back of each demurrage by the Government officers on this basis as a proper charge. On January 22, 1951 the bills were reaudited and overpayments of about $8,400 were refunded by the Railroad to the Government. At this second meeting no question was raised as to the proper amount of free time on the shipments in suit, and the demurrage bills were paid on the basis of 24 hours’ free time. This determination was not questioned until several years later when the Government deducted the amount for which plaintiff now sues from other payments due plaintiff.
We conclude that this settlement and payment in 1950 and 1951 by defendant to plaintiff of the demurrage bills on the shipments in suit on the basis of 24 hours’ free time at Gold Bar was correct; that the cars were held at Gold Bar for reshipment under Tariff 4-Z and not held in transit to Mukilteo under Tariff 28-1; that the free time for demurrage at Gold Bar was 24 hours; and that there was no final agreement between the parties to the contrary.
Defendant also asserts that part of plaintiff’s claim is barred by a judgment of this court in 1959 in favor of plaintiff [1] for additional line-haul charges on most of the shipments here in suit, upon which the Government paid plaintiff $104,808.04. Defendant cites 28 U.S.C. § 2517 (b) which provides:
Payment of any such judgment and of interest thereon shall be a full discharge to the United States of all claims and demands arising out of the matters involved in the case or controversy.
*233 Defendant also relies on language in the preamble to the court’s order of July 2, 1957, adopting revisions to the court’s procedures in common carrier cases, in part as follows:
* * * In order to secure a more expeditious disposition of these cases by * * * (b) limiting the issues to carrier’s bills which are actually in dispute; * * *
The Government’s position is that the basis of all suits filed in this court after adoption of this rule is the original “bill in dispute” in the prior rate case in this court — viz. the original bill of lading; therefore a judgment on that bill of lading is res judicata as to all relevant issues which could have been but were not raised concerning that bill of lading, including the issue of demurrage in the present case.
Although plaintiff’s cause of action for additional line-haul charges in the case formerly adjudged by this court arose out of the same transaction (the bill of lading), the present action is based on bills for demurrage which are separate and distinct from the bills for transportation charges. Before these two cases came to issue in this court, the Government had asserted its deductions from the carrier for transportation charges separately from its deductions for demurrage by separate overpayment notices, and by separate deductions at widely different times. Demurrage charges are no part of the rate charges in effect for transportation of the shipment. Although they may follow the shipment and be collected together with the transportation charges, they are for a distinct and separate service. Krause Brothers Lumber Co. v. Director General, 92 ICC 450-452. In the former case in this court, judgment for plaintiff was entered upon agreement between the parties on an amount in full settlement of all claims asserted for additional transportation charges. No-claims for demurrage were there asserted and the prior j udgment is not res j udicata as to the present case. Plaintiff’s claim is not barred by Section 28 U.S.C. 2517 or the December 2,1957 rule of this court as to carriers’ bills.
Defendant has counterclaimed for $12,966.69, based upon a re-computation by defendant of the rates for line-haul service of moving several of the shipments involved from Bellemont, Arizona to Gold Bar, Washington, Demurrage is not involved.
*234 Plaintiff concedes that defendant is entitled to recover $4,240.33 on the counterclaim, but disputes the remainder of $8,756.36.
There was no single factor through-rate applicable between the point of origin (Bellemont) and the billed destination (Gold Bar). Where no rate is named from point of origin to destination for a shipment via the route of movement, the lowest combination of rates applicable via the route-of movement is the legal rate.
In arriving at its “lowest combination of rates applicable”' the Government has combined regular published tariff rates for part of the route of movement with a Section 22 Quotation rate for the other part. A Section 22 Quotation is defined as a special rate tender authorized under 49 U.S.C. 22 by which the carrier offers transportation to special persons free or at rates reduced from those provided under published tariffs.
Defendant grants that insofar as the general shipping public is concerned the rates used in constructing a combination through-rate must be published and filed rates, under Tariff Circular 20 of the Interstate Commerce Commission in effect at the time of movement. However, defendant asserts that Section 22 of the Interstate Commerce Act, 49 U.S.C. 22, provides in part:
(1) Nothing in this chapter shall prevent the carriage * * * of property free or at reduced rates for the United States, * * *.
This section further provides that these reduced rates may be entered into without regard to any other section of Part I of the Act including Section (6) pertaining to tariffs filed with the Commission and posted.
Defendant argues that as a consequence of this legislative exemption, the Section 22 Rates would’not be subject to the administrative ruling of the Commission requiring that all rates used in making combination through-rates must be filed with the Commission. Defendant cites an excerpt from the opinion of this court in Great Northern Railway Company v. United States, 156 Ct. Cl. 332, 336, 312 F. 2d 901, 903:
On the other hand, if a § 22 quotation rate reveals an intention that it may be so used, it may be combined with *235 another quotation rate to produce an aggregate rate lower than the through tariff rate. * * *. And perhaps, since the Government may receive preferences, a quotation rate may also be combined with a local tariff if the quotation is designed to be used im, that manner. * * * [Emphasis supplied.]
The cited case can be clearly distinguished from the present case, since the court held the Government was not entitled to combine a Section 22 Quotation with a tariff rate in order to defeat the application of a single factor joint through-rate, which is not involved in the present case. It also appears, in the former cited case that when the carriers issuing those quotations intended to permit their use in combination with tariff rates, an express provision to this effect was inserted in the quotation.
Such a provision is absent from the Section 22 Quotation involved in the present case, nor is there any indication that the quotation was designed to be used in combination with a local tariff, as considered by the court in the earlier Great Northern case, supra.
Item 6 of the quotation in the present case provided in part:
Shipments made under this quotation are subject to all charges and all allowances * * * and to all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment or which increase or decrease the value of the service, without, in any case, any land-grant deduction. (T.C.F.B. Section 22 Quotation No. 13-A, p. 2, Def’s. Exh. 5.) [Emphasis added.]
Rule 14-C of the Interstate Commerce Commission’s Tariff’s Circular 20 restricting combination rates to filed rates does not, by itself, apply to an unregulated Section 22 Quotation. However, Item 6 of the No. 13-A quotation refers to all rules “which in any way increase or decrease the amount to be paid on any shipment.” The Commissioner’s ruling has this effect, and must be considered as being incorporated within the Section 22 Quotation No. 13-A.
We conclude that, except for that part of the counterclaim conceded by plaintiff, defendant’s counterclaim should be dismissed.
*236 Judgment will be entered for plaintiff in the sum of $24,474.90 less the sum of $4,240.33 due defendant on its counterclaim; the net amount of this judgment for plaintiff to be $20,234.57.
Davis, Judge; Lakamore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Definitions. The parties stipulated for the purposes of this case the following definitions of transportation terminology :
(a) Through Bate. A charge in cents per one hundred pounds for the complete service in moving traffic from origin to destination. A through rate may be a local rate, a joint rate, or a combination of separately established rates. When joint it is a rate applying over the lines of two or more carriers, and is made by arrangement or agreement. When local it applies wholly on the lines of one railroad. A through rate may be a combination through rate or a single factor through rate. It is a single factor rate when it is published as a unit or a single sum in cents per one-hundred pounds from origin to destination. A combination through rate is a charge for the through movement determined by adding separately established rates applying from and to points intermediate between origin and destination. A combination through rate applies over a route when there is no single factor rate applying between origin and destination over a route.
(b) Aggregate of Intermediate Bates. A single factor through rate applying between origin and destination takes precedence over a lower aggregate or sum of combination rates applying between origin and destination, except when the single factor through rate is subject to an aggregate of intermediates rate rule which provides as follows: “If the aggregate of separately established (joint, local and/or proportional) rates applicable on Interstate traffic contained in tariffs lawfully on file with the Interstate Commerce Commission applicable via any route over which the through rates published in this tariff apply, produces a lower charge *237 on any shipment than the rate published herein, such aggregate of rates will apply via all routes * * * over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment.” Through rates constructed under this rule are designated aggregate of intermediate rates.
(c) Line Haul Transportation. The service of moving traffic over the road from origin to destination. _
_ (d) In Transit. In the course of passing from origin to destination.
(e) Bach Haul. To haul a shipment back over part of a route which it has already traveled. The back haul represents the difference between the distance actually traveled by the shipment and the distance which would have been traveled if the shipment moved in a direct line from point of origin to point of destination.
(f) Destination. The place to which a shipment is sent.
(g) Section 22 Quotation. A special rate tender authorized under 49 U.S.C. 22 by which the carrier offers transportation services to special persons free or at reduced rates from those provided for under published tariffs.
(h) Tariff. A schedule of rates, rules or charges for railroad transportation services published and on file with the Interstate Commerce Commission under sec. 6 (7) of the Interstate Commerce Act.
(i) Demurrage. A carrier’s charge to the shipper for detention of a car beyond the free time published in tariffs for loading, unloading, diversion, reshipment, etc. Demurrage charges are governed by the rules and regulations set forth in published tariffs and the Interstate Commerce Commission’s service orders.
(j) Free Time. The period of time provided by tariff during which no demurrage charge is assessed following notification that the car has arrived at destination or following notification of readiness to deliver the car.
(k) Per Diem. A rental charge per car per day assessed against a carrier using the railroad cars belonging to another carrier.
(l) Diversion and for Reconsignment. The term diversion or reconsignment means: (1) a change in the name of the consignee; (2) a change in the name of the consignor; (3) a change in the destination; (4) achanga in the route at the request of the consignor, consignee or owner; and (5) any other instructions given by the consignee, consignor or owner necessary to effect deliv *238 ery and requiring an addition to or a change in billing or an additional movement of the car, or both.
(m) Reshipment. A reshipment is the making of a new contract'by which under a new rate the entire original lading, without being unloaded, is forwarded in the same car to another destination.
(n) Notice of Arrival. The carrier’s act of advising a shipper, owner or consignee that a particular shipment has reached its destination.
(o) Notice of Readiness to Deliver at the Port. The act of the carrier in advising a shipper, owner or consignee that the carrier is ready, willing and able to deliver a car at a port for transfer of the lading to water carrier.
(p) Released From Demurrage. The point at which demurrage charges cease to accrue on a particular car. Ordinarily release occurs when the car is unloaded or the shipper issues new shipping instructions.
(q) Track Storage Charge. A charge for the service of warehousing dangerous or extra-hazardous freight in railroad cars and governed by published tariffs naming storage rules and charges.
(r) Accomplishing a Government Bill of Lading. The act of a government transportation officer in certifying on the bill of lading that a shipment has been received by the government in apparent good order and condition except as otherwise set forth.
(s) Form 1003 Overpayment Notice. The document in which the Federal Government, acting through the General Accounting Office, notifies a carrier that excess charges were exacted for a particular transportation service and demanding refunds fading which deductions will be made from amounts otherwse due the carrier by the Government pursuant to statutory authority vested in the General Accounting Office by 49 U.S.O. 66.
2. Identity of plaintiff. Plaintiff is a corporation organized and existing under the laws of the State of Minnesota and is a common carrier by railroad in interstate commerce over its own lines and jointly with other lines.
3. Commodities involved. During the period from July 17, 1950 to October 14, 1950, plaintiff and its connecting carriers, at the request of defendant, performed interstate rail transportation service for defendant in the movement of 569 rail carload shipments of ammunition for cannon with explosive projectiles, smokeless powder, fireworks, bombs (incendiary), detonating fuzes, bombs, bombs (GP-TNT), *239 bomb fin assemblies (detonating fuzes and primers), high explosives, primers, lighter fuzes, chemical ammunition (phosphorus, explosive), explosive projectiles, percussion fuzes and projectile parts, as set forth on plaintiff’s Schedule A annexed to the petition herein.
4. Origins and destinations. The 569 Government bills of lading covering these shipments are numbered as set forth on said schedule. According to these bills of lading, the shipments were originally destined to Mukilteo, Washington, from the following origins: McCune, New Mexico; Clover, Utah; Warner, Utah; Herlong, California; Belle-mont, Arizona; Army Point, California; Ordnance, Oregon; Provo, South Dakota; and Panhandle, Nebraska.
5. Representative bills of lading. The parties have stipulated that 31 of the involved 569 shipments are representative of all shipments in suit insofar as the issue of demurrage is concerned. Each of the 31 shipments is represented by a Government bill of lading.
6. Routing to Gold Bar. The 31 representative shipments moved toward Mukilteo, Washington, from the south through Bieber (California), Portland (Oregon) or Seattle (Washington), and plaintiff received them from connecting carriers at one of these three points for further transportation to destination. When the shipments reached Interbay (Washington), located south of Mukilteo and a few miles north of Seattle, Government authorities diverted them to Gold Bar (Washington). Pursuant to these diversion orders the involved shipments moved north from Inter-bay through Mukilteo to Everett (Washington), thence east to Gold Bar.
7. Detention at Gold Bar. Gold Bar was and is not a port for the interchange of lading with water carriers, but is a railroad station on the lines of the Great Northern Railway 32.9 rail miles east of Mukilteo. No Government facilities for the receipt or storage of ammunition were located at Gold Bar during the times these shipments moved. Upon arrival at Gold Bar the cars were not unloaded but were set out on storage tracks and held for periods ranging from about one day to two weeks.
8. Notifieation of arrimad at Gold Bar. On arrival of the *240 shipments at Gold Bar plaintiff orally notified Government transportation officers of the day and hour of arrival (oral notice of arrival having been agreed to in writing) and this information was set down on plaintiff’s station records at Gold Bar and subsequently transcribed on demurrage bills, for the shipments.
9. Shipments outbound from Gold Bar. Subsequent to the-detenten of the cars at Gold Bar, a second bill of lading was issued by the Government to cover each of the said 569 shipments outbound from Gold Bar. The destination outbound from Gold Bar designated on all but a few of these 569 second bills of lading was Mukilteo, while as to 12 it was-Lacoda (Oregon). Mukilteo and Lacoda were both ports for the interchange of lading with water carriers. There is no dispute as to the demurrage charges on the few shipments-which moved outbound from Gold Bar to Lacoda, and the parties agree that 24 hours free time is applicable for the car detention at Gold Bar. All 569 shipments involved in the-suit were presumably transloaded onto vessels at Mukilteo- and Lacoda for overseas shipment.
10. Overseas destination of shipments. The involved shipments were made during the Korean conflict and their destination overseas was not generally known to the public. Each bill of lading was marked with a code showing overseas destination, but it is not demonstrated that plaintiff could translate the code into geographical terms.[2] Otherwise, defendant gave plaintiff no information or notice as to the overseas destination.
11. Other detentions at Gold Bar. During the period of approximately July-November 1950 a substantial but undisclosed number of Government shipments of ammunition and high explosives not involved in this proceeding were consigned to Mukilteo for export via eastern routes through Spokane (Washington), but were held in transit to the port at Gold Bar due to congestion at the port of Mukilteo. Many of these unrelated shipments thus held at Gold Bar *241 were then forwarded to Mukilteo for export, and the plaintiff allowed the defendant 10 days free time before the assessment of demurrage charges.
12. Gold Bar as part of Muldlteo port. During World War II on cars destined to Mukilteo for transshipment on vessels the parties considered “holding at Gold Bar as an integral part of the Mukilteo port terminal operation.”
13. Freight Tariff 4-Z. During the period from July 17, 1950 to October 14, 1950, plaintiff had duly published and filed with the Interstate Commerce Commission B. T. Jones’ Freight Tariff 4-Z, naming car demurrage rules and charges applying at all points on railroads party thereto, including plaintiff. Said tariff to which plaintiff was a party, as supplemented by supplements 1 through 9, inclusive, contained rules, regulations and charges for demurrage as follows:
(A) Item No. 5 entitled “General Application of De-murrage Bules and Charges” provided:
(a) The Demurrage Bules and Charges, published in tariff, are the separately established rules and charges of each of the participating carriers, and apply on International, Interstate, and Intrastate traffic at all points on the railroads listed on pages 3 to 14, inclusive, * * * except as otherwise specifically provided herein. * * *.
(b) The disposition at point of detention determines the purpose for which a car is held and the rule applicable thereto, except where there is specific tariff provision to the contrary.
(B) Under a heading entitled “General Exception to Application of Demurrage Bules and Charges”, said Jones Freight Tariff 4-Z provided in Item 10:
The following cars are not subject to Demurrage Bules and Charges, published in Section No. 1, pages 39 to 50, inclusive.
* * * * *
(b) At the ports on cars containing freight for trans-shipment to or from vessels and at Brownsville, Eagle Pass, El Paso, Laredo and Presidio, Texas, on cars containing export traffic, when rules and charges applicable thereto are provided in the tariffs of the individual carriers lawfully on file with the Interstate Commerce Commission, except to the extent indicated *242 in such tariffs. This exception also applies to such cars when held in transit because they cannot reasonably be accommodated at the ports.
(C) Rule No. 1 to Jones Freight Tariff 4r-Z entitled “Cars Subject to Rules” provided in Section A:
Cars of either railroad or private ownership, held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose * * * are subject to these demurrage rules, except as provided in Section B.
(D) Rule No. 2 of said Jones Freight Tariff 4r-Z entitled “Free Time Allowed” provided:
Twenty-four hours’ (one day) free time will be allowed : 1. When cars are held for reconsignment, diversion or reshipment, or held in transit on orders of consignor, consignee or owner.
Note 3 to Section B of Rule No. 2 of Jones Freight Tariff 4-Z defined a reshipment as “the making of a new contract by which under a new rate the entire original lading, without being unloaded, is forwarded in the same car to another destination.”
(E) Rule No. 3 of Jones Freight Tariff No. 4-Z entitled “Computing Time” provided in part:
* * * time will be computed from the first 7:00 a.m. after notice of arrival is sent or given to the consignee or party entitled to receive same.
(F) Rule No. 7, Section A, Jones Freight Tariff 4-Z entitled “Demurrage Charges” provided as follows:
* * * After the expiration of free time allowed (except as otherwise provided in these Rules), the following demurrage charges per car per day, or fraction of a day, will be made until car is released: For each of the first four days $3.00. For each succeeding day $6.00.
From time to time during the period July 17,1950 to October 14, 1950, the Interstate Commerce Commission issued various service orders published as Supplements 1 through 9 to Jones Freight Tariff 4-Z, increasing said demurrage charges to $5 per day for the first two days, $10 per day for the second two days, and $20 per day thereafter.
14. Freight Tariff 28-1. During the period July 17, 1950 *243 to October 14, 1950, plaintiff was a party to North Pacific Coast Freight Bureau Local Freight Tariff 28-1 naming “Demurrage Charges and Free Time Allowance on Cars Held at North Coast Ports of Interchange * * * For Delivery to Water Carriers.” Said tariff was published and on file with the Interstate Commerce Commission and was in effect, as amended by Supplement No. 1 thereto, from May 17, 1950 through and including November 8, 1950, on which date it was canceled by North Pacific Coast Freight Tariff No. 28-J, I.C.C. 832.
15. Provisions of 28-I. Said Tariff 28-1 provided in pertinent part:
(A) Buies:
Notice of arrival, or of carrier’s readiness to deliver, at port shall be sent or given consignee or party entitled to receive same by the line haul carrier’s agent in writing or, in lieu thereof, as otherwise agreed to in writing, by the railroad and consignee, such notice to contain car initials and number, point of shipment, contents and if transferred in transit, the initials and number of original car.
(B) Free Time:
On Carload Freight Originating at Points in the United States * * * and Destined to Points in other foreign countries; * * * Free Time Allowed for Unloading 240 hours (10 days).
(C) Note No. 1 of said Tariff 28-1 to which item 55 of that tariff was subject to provided:
Free time is to be computed from first 7:00 A.M. after notice of arrival at port * * * or of carriers’ readiness to deliver at port, except on freight as mentioned in Note 3, on which free time is to be computed from first 7:0 AM. after disposition order is received, without further notice of arrival.
(D) Note 3 of the said North Pacific Coast Freight Bureau Tariff No. 28-I, to which Item 55 of that tariff was subject, provided in part:
(a) Freight, except grain, billed for local consignment [3] and ordered for export subsequent to twenty-four *244 hours, computed from first 7:00 A.M. after notice of arrival has been sent or given, exclusive of Saturdays, Sundays and holidays * * * will be treated as local traffic and subject to the Demurrage Kates, Bules and Kegulations governing such traffic as named in Agent B. T. Jones’ Tariff, No. 4-Y, I.C.C. 3963, supplements thereto or successive issues thereof.
$ $ $ $ *
(f) Freight, except grain, and coal unloaded at ship-side, on which the billing shows “for export” but does not show the destination country, and on which written advice of the destination country is not furnished the carriers within twenty-four hours, computed from first 7:00 A.M. after notice of arrival * * * has been sent or given exclusive of Saturdays, Sundays and holidays * * * will be subject to the demurrage rules and charges published in Agent B. T. Jones’ Tariff 4-Y, I.C.C. 3963, supplements thereto or successive issues thereof.
The demurrage rules and charges published in the above-described tariffs have two purposes: (a) they primarily served as an inducement to the shipper to unload, reship or release railroad cars promptly, and (b) they help compensate the carrier for the per diem expense incurred by that carrier when using the equipment belonging to another line. Per diem is a rental charge per car per day which an owning line assesses another line for use of car equipment belonging to the owning line. During 1950 this per diem charge was $1.75 per car per day. Demurrage occurs only after a reasonable time (established by tariff) has elapsed after a car has been placed either actually or constructively for loading, unloading, diversion, reshipment, etc., while per diem charges begin to accrue immediately upon interchange from one carrier to another.
16. Meeting of August 10, 1950. On August 10, 1950, a meeting attended by Mr. Hardy, General Freight Traffic Manager, and Mr. Doane, General Agent of plaintiff, was held in the office of United States Army Transportation Corps in Washington, D.C., to discuss shipments of ammunition and explosives destined to Mukilteo and held at Gold Bar in that year. The Memorandum of August 11, 1950, states:
1. In line with the attached letter of 2 August 1950, Mr. Hardy, General Freight Traffic Manager, and Mr *245 Doane, General Agent of the Great Northern Eailway, visited this office Thursday, 10 August 1950.
2. It was agreed that the Great Northern Eailway would upon request from this office agree that on all shipments of explosives held at Goldbar, Washington destined to Mukilteo, Washington they would protect the through rate to Everett, Washington, domestic or export as applicable waiving the tariff provision that requires shipments held for disposition be reconsigned or diverted within 24 hours.
3. It was further agreed that the Great Northern Eail-way would protect the export demurrage while cars were held at Goldbar, Washington, and on being forwarded the demurrage would be on an accumulative basis. That is, where ten days free time is allowed, we would be allowed ten days while the car was held at Goldbar or Mukilteo, or if held at both points, the combined time held at the two points would be accumulated to make the total free time allowed under applicable tariff.
4. Should it be necessary that the railroad furnish police protection while shipments are held at Goldbar, the carrier will be reimbursed on the basis of actual out-of-pocket expense.
5. It is requested that you address such a request to the General Freight Traffic Manager of the Great Northern Eailway with the carbon copy to Mr. Doane at his Washington, D.G. Office and a copy to this branch for record.
17. Letters from Army to plaintiff. Following this conference and memorandum, the Department of the Army wrote plaintiff on August 17 and 18,1950.
(A) The letter of August 18, 1950, entitled “Stop in Transit at Goldbar, Washington”, stated in part:
Eeference is made to conference between Mr. Hardy, Mr. Doane and Mr. Needham on 10 August 1950, regarding the handling of shipments destined Mukilteo, Washington, when held at Goldbar, Washington, on orders for disposition.
Your attention is invited to copy of Section 22 Quotation, Great Northern Eailway Eate Advice No. Government WD 41, published 1 January 1947, which provides protection of the Everett, Washington rates on shipments destined Mukilteo, Washington.
It is requested that this quotation be broadened to provide that cars held at Goldbar, Washington on orders for disposition, later reforwarded to Mukilteo, Washington, for export will be entitled to free time and *246 demurrage charges as provided in NPCFB Tariff 28-1 Agent Bohon’s ICC 821, except when car is reforwarded from Goldbar, Washington, to Mukilteo, Washington, the free time authorized herein shall apply to the aggregate period of detention at both points.
(B) The letter dated August 17, 1950, stated in part:
On or about 1 October 1950, it is anticipated to reopen the Tulalip Back-Up-Storage Depot at Tulalip, Washington near Marysville, Washington, to be used exclusively for temporary tract storage of ammunition which is or will be ultimately consigned for export to be handled through Mukilteo, Washington.
At the present time any cars which may be held at Tulalip would be subject to maximum of 48 hours free time after which demurrage charges would accrue. Concurrently there is in effect provisions allowing 10 days free time on export shipments consigned to Mukilteo, Washington. There are restrictions in effect which provide that on shipments of ammunition and high explosives handled through Mukilteo no more cars may move into Mukilteo within any 24 hour period than can be unloaded within a 24 hour period running consecutively.
It is requested that a Section 22 Quotation be issued to provide on carloads of ammunition and explosives held in Tulalip Back-Up-Storage Depot for delivery to Mukilteo be accorded export free time not to exceed 10 days and the restrictions limiting the time to 48 hours at points other than the ports be applicable at Mukilteo.
18. Letter from, plaintiff to defendant. By letter dated October 13, 1950, received by the Department of the Army on October 16,1950, plaintiff responded to the above requests for Section 22 Quotations and stated:
Please see Mr. Paul’s letter of August 17th, file TCCLT-FE 551.2 Ammunition and Explosives HSP-6157, addressed to Mr. O’Brien, and your letter of August 18th, file TCCLT-FE 551.2 Stop In Transit at Goldbar, Wash. CLT — 6155, addressed to me, written after discussion Mr. Doane and I had with you and Mr. Needham, regarding the handling of shipments destined Mukilteo when held at Gold Bar, Washington on orders for disposition.
We have made a survey of this entire situation in collaboration with our Accounting Department, as a result of which it seems to us there is no necessity for *247 issuance of a formal Section 22 quotation which would have the effect of providing for the application of free time authorized by tariff at Pacific Coast ports for determination of demurrage on export shipments.
Our conclusion is based primarily on the fact that our review indicates the only difference between the situation which existed during the perod January 26, 1942 to May 5, 1948 and the present time is that during the former period there was in effect A.A.R. Section 22 Quotation No. 12, pertaining to reconsignment from control stations. As a practical matter, this quotation still relied upon the governing tariffs, insofar as the demurrage feature is concerned, so that, in reality, on the question we have before us, namely, computation of demurrage, there is no difference.
It is my understanding that we are dealing with bona fide export shipments, which will be initially billed to Mukilteo. If these shipments actually were to move without interruption to Mukilteo, and there interchanged to a water carrier, Agent Bohon’s Tariff 28-1, ICC No. 821, would govern. I realize that Mukilteo is not specifically named in this tariff but this tariff is described on its title page as “naming demurrage charges and free time allowance on cars held at North Coast ports of interchange, including Aberdeen, Wash., etc.” The use of the word “including,” as distinguished from “namely,” or its equivalent, in my opinion, leaves this tariff open for application at any point of interchange, which obviously would include Mukilteo, Anacortes, or any other point similarly situated.
The question we have before us deals with not only the computation at the port of interchange proper but also with the added feature of the time consumed at Gold Bar, when for good and sufficient reason, it is necessary to hold cars in that yard, which, while not a part of the Mukilteo or other Coast port terminal facilities proper, is actually an auxiliary facility designed to perform most efficiently the transportation service required for this movement. Your particular attention is called to Item 20 of Bohon’s ICC No. 821, which reads in part “Notice of arrival, or of carrier’s readiness to deliver, at port * * Please note the underlined portion of this rule, which, in my opinion, permits us to follow the procedure accepted both by the Government and ourselves during the so-called World War II period that considered the holding at Gold Bar as an integral part of the Mukilteo port terminal operation, and the application of the current tariff provisions governing demur- *248 rage and free time allowance to this combined operation as a whole.
This is in consonance with what we believe to be both the spirit and the letter of the tariff, and our Auditor of Station Accounts’ office has already undertaken to work out both with our own agents and the Transportation Officer at Mukilteo', the application of the tariff in this manner, which, it seems to me actually meets the problem you have in mind and obviates the practical necessity for any consideration of filing an additional Section 22 quotation.
May I suggest that you review the matter again in the light of this letter and advise me whether or not you agree with my opinion
19. Meeting of November 14, 1950. On November 14,1950, a meeting attended by plaintiff’s traveling auditor and two civilian officers of defendant’s Seattle Port of Embarkation Office was held in Seattle, Washington. This meeting was arranged by plaintiff’s traveling auditor in order to accomplish the certification of the demurrage bills for the shipments in suit. Certification of demurrage bills consists of the act of a Government transportation officer in stamping the back of each demurrage bill that “the car shown on this bill has been held between the dates as stated, that the charge is proper and payable from public funds * * Plaintiff was experiencing difficulty in obtaining these certifications on these demurrage bills because the Government transportation officers at Seattle were questioning the allowance of only one day, as opposed to ten days, free time on the shipment reaching Gold Bar from the south through Seattle. After this meeting, the Government transportation officers were satisfied that the demurrage was properly assessed on the basis of 24 hours free time on the shipments from the south. For the most part, certification of the de-murrage bills followed this meeting. Subsequently, overcharges were developed on a number of these demurrage bills which arose out of improper demurrage rates and improper release dates used in the computation of the bills. Following a second meeting between plaintiff’s and defendant’s officers at Seattle on January 22, 1951, the bills were reaudited by plaintiff and overpayments of about $8,400 were developed and refunded from plaintiff to defendant. At this second *249 meeting no question was raised as to tlie proper amount of free time on tbe shipments in suit.
20. Contentions of plaintiff.[4] Plaintiff claims demurrage charges for the car detention at Gold Bar on the 669 shipments in suit based upon one day free time under the provisions of Jones’ Freight Tariff 4-Z. Plaintiff contends that demurrage charges (at the rates per car per day set forth on the schedule attached to its petition) began to accrue when 24 hours elapsed after the first 7 a.m., following notice of arrival of the cars at Gold Bar.
21. Contentions of defendant[4] Defendant contends that Tariff 4-Z does not apply to the shipments in suit, that the issue of free time applicable to the shipments in suit must be determined under Tariff 28-1, that the holding operation at Gold Bar was an integral part of the port terminal facilities of Mukilteo, and that the demurrage charges did not accrue until the arrival of the cars at Gold Bar and after 10 days had elapsed from the first 7 a.m., following the plaintiff’s notice of readiness to deliver at the port.[5]
Defendant admits that the involved shipments which were reshipped from Gold Bar to Lacoda, Oregon, for export are entitled to only 24 hours’ free time during the car detention at Gold Bar. It distinguishes a movement outbound from Gold Bar to Lacoda from a shipment outbound from Gold Bar to Mukilteo for demurrage purposes by reliance on Item 80 of NPCFB Tariff 28-I. Item 80 of Tariff 28-1 provides 24 hours’ free time on carload freight originating at points in the United States and destined to points beyond the port, when diverted, reconsigned or reshipped from one port to another port.
22. Line-haul rates involved. Defendant treated the shipments as terminating at Gold Bar for the purpose of constructing rates for line-haul service, although it knew that the ultimate destination was Mukilteo for transshipment. Temporary congestion of port facilities at Mukilteo was responsible for this procedure. Under its counterclaim, de *250 fendant seeks a through combination of intermediate rates from origin to Gold Bar. Defendant paid a rate of 44 cents per one hundred pounds from Gold Bar to Mukilteo under the provisions of A.A.R. Section 22 Quotation 13-A. For the shipments in suit not embraced in the counterclaim, the Government paid a rate to Gold Bar based upon Section 22 Quotation 13 or the tariff rates to that point, whichever was lower.
23. Backhaul movement. Plaintiff conducted a study of what the freight rate would have been if the shipments in suit are to be regarded as through movements to Mukilteo routed via Gold Bar and held in transit there. Both parties agreed that if the shipments in suit are to be so regarded, a backhaul movement was involved.
ISSUE OP PRIOR JUDGMENT
24. Plaintiff’s diversion tariff. Plaintiff’s diversion and reconsignment tariff contained the following rules governing the application of line-haul freight rates for backhaul movements.
( a) Rule 2, Item No. 30.
Where the through rate is authorized under these rules, it is the applicable rate (local rate, joint rate, or combination of intermediate rates) in effect on date of shipment from point of origin over the route of movement via the diversion or reconsignment point to final destination. ('See Note 1 below.) (See Rule 5 in Item No. 45.)
Note 1. — Interstate Traffic moving between Minot, N.D., or points west thereof and points on G. N. Ry. lines, Surrey, N.D., to St. Paul, Minneapolis and Minnesota Transfer, Minn., or beyond, will come under the application of this rule allowing diversion or reconsignment in transit when handled, via the line through Devils Lake, Grand Forks and Fargo, N.D., as well as via the lines through New Rockford, Oasselton, N.D., Breckenridge and Willmar, Minn., or Fargo, N.D., Fergus Falls and St. Cloud, Minn., providing no backhaul is involved.
$ $ ‡ ‡ ^
(b) Supplement 61, effective March 15, 1949, and Supplement 67, effective September 6, 1950, Rule 5, Item 45-B and Item 45-C.
*251 CHANGE IN DESTINATION
(a) Only one change in destination at the applicable rate (see Rule 2 in Item No. 30) from point of origin to final destination will be permitted by this line under these rules, and then only provided the car has not had a previous change in destination while on the lines of other carriers after leaving the initial billing point.
(b) Except as provided in Paragraph (c) or (d) of this rule, if, after a car has had one change in destination after leaving the initial billing point, the destination is again changed upon request of consignor, consignee or owner, the shipment will be subject to the tariff rates applicable on a shipment terminating at and on a shipment originating at:
(1) The point at which the second or subsequent change in destination is accomplished; or,
(2) The point of destination named in the first order changing the original destination of the shipment, whichever is lower, plus all charges previously accrued.
(c) Rule 7, Item No. 55, Diversion or Reconsignment in Transit.
If a car is diverted or reconsigned in transit prior to arrival at original destination, the through rate (Rule 2 in Item No. 30) will be applied, plus a charge of $2.48 per car for such service * * *.
(d) Supplement 66, Rule 14, effective May 1, 1950, provided:
Item No. 90. Back-Haul Rule.
(a) Before Placement: If a car is diverted or reconsigned before placement for unloading, the through rate * * * will be applied from original shipping point to final destination which would apply in the absence of the out-of-line service, plus the applicable rates (or back-haul rates if any), to cover the back-haul service in each direction, plus charge of $6.44 per car will be made in such cases when diversion or reconsignment is performed in the States of Montana, Idaho, Washington, * * * but not in excess of the full combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment, without the addition of diversion or re-consignment charge.
25. Plaintiff's contention re backhaul. It is plaintiff’s contention that if the diversion orders at Interbay constituted *252 the shipments in suit as through movements to Mukilteo routed via Gold Bar, line-haul transportation charges would be computed under this backhaul rule as follows: First, the rate from origin to final destination (Mukilteo) would be applied plus the rate from Mukilteo to Gold Bar and the rate from Gold Bar back to Mukilteo (to cover the backhaul service in each direction), plus also a diversion charge of $6.44 per car. Second, the sum of those rates and charges under the backhaul rule could not exceed the full combination of tariff rates applicable on a shipment terminating at and originating at the diversion point (in this case, Inter-bay).
26. Defendant's contention re bachhaul. It is defendant’s position that the provisions of the backhaul rule have no application to the shipments in question. Defendant contends there were two diversions, first at Interbay providing for a move to Gold Bar, second at Gold Bar to final destination, Mukilteo.[6] The Government paid charges on a combination of rates to Gold Bar. Defendant contends that it treated Gold Bar as a destination for billing purposes only, but not as the final destination. Under the provisions of Rule 5(b) of plaintiff’s Exhibit 8, the movement from Gold Bar to Mukilteo has to be treated as a new shipment whether it moves on the same bill of lading or a new bill of lading.
27. Line-haul rates paid by defendant. Using a shipment in suit originating at Herlong, California, as an example, a total rate of $2.27 per one-hundred pounds was paid by defendant on the theory that the shipment terminated and originated at Gold Bar. (Note: $2.27 is the total line-haul rate, in addition to which defendant paid a diversion charge of $4.05 per car). The $2.27 is composed of a through combination rate of $1.88 to Gold Bar for one complete shipment under the inbound bill of lading, and a rate of 44 cents per one-hundred pounds for the movement to Mukilteo from Gold Bar under the outbound bill of lading.
Under the plaintiff’s theory of the first alternative to the backhaul rule, assuming that the shipment consisted of a through movement to Mukilteo routed via Gold Bar, plaintiff computed a combination through tariff rate of $2.91 per *253 one-hundred pounds plus a diversion charge of $6.44 per car. Applying the second alternative to the backhaul rule on that shipment, plaintiff computed a total rate of $2.59 composed of a combination through tariff rate to the diversion point of Interbay, and the tariff rate from Interbay to Mukilteo. Under the second alternative, plaintiff took a combination through tariff rate from Herlong to Interbay, a tariff rate from Interbay to Gold Bar, and a tariff rate from Gold Bar to Mukilteo. Plaintiff’s routing guide (to which its tariffs are subject) provides that on a shipment from Interbay to Mukilteo no backhaul service will be performed at the direct rate between Interbay and Mukilteo. The defendant used a tariff rate to Interbay, a tariff rate to Gold Bar, and a Section 22 rate from Gold Bar to Mukilteo. Defendant is treating the rates named in Quotation 13-A as a tariff rate within the meaning of Buie 5 (b).
28. Items involved in both suits. Defendant’s Schedule A-2 lists plaintiff’s bill numbers and the amounts of plaintiff’s claim for demurrage which defendant contends are barred by reason of the fact that the same shipments were involved in Great Northern Railway Company v. United States. Ct. Cl. No. 10-59. In Great Northern Railway Company,, supra, plaintiff brought suit against the United States for recovery of deductions by the General Accounting Office from line-haul transportation charges on certain shipments of ammunition and explosives transported for defendant by plaintiff during 1950. On July 31, 1959, the Court of Claims entered judgment for plaintiff in that suit, and subsequently, this judgment was paid. On September 8, 1959, plaintiff filed suit in the instant case to recover separate deductions for demurrage on shipments of ammunition during 1950. In this second suit a number of carload shipments identified by Government bills of lading had also been involved in the first suit for line-haul charges. The parties introduced a statement showing the shipments which are common to the two suits, the dates of deduction on account of the line-haul charges, and the dates of deduction on account of the demurrage charges. In each instance, deductions for alleged overpayment of line-haul charges and deductions for alleged overpayment of demurrage were directed against different *254 bills for different shipments on different dates even though both types of alleged overpayments occurred on the same carload shipment.
29. Contentions by both 'parties. Defendant contends with respect to this issue that plaintiff knew at the time it brought suit for line-haul charges that it had additional causes of action for demurrage charges on the same shipments, and that plaintiff should have pleaded both causes of action, in accordance with the rules of the Court of Claims in order to avoid a multiplicity of suits.
Plaintiff claims on this issue that its cause of action in each suit is based upon and arises out of the deductions, that since separate overpayment notices and separate deductions were made by defendant (one for line-haul charges and the other for demurrage) against charges for different services, it has separate causes of action which it claims it is entitled to pursue in separate actions without undue hardship on defendant. The chief clerk of plaintiff’s Government bureau who audited freight charges on Government shipments during 1950 and who prepared the schedules for filing suit both in this case and Court of Claims No. 10-59 testified he had no knowledge when preparing the schedule for the line-haul transportation charges involved in Court of Claims No. 10-59 that demurrage charges were outstanding on the same shipments.
Plaintiff’s suit against the United States in Great Northern Railway Company v. United States, supra, was filed on January 8, 1959, to recover deductions by the General Accounting Office of overpayments of line-haul transportation ■charges on certain shipments of ammunition and explosives transported during 1950, some of which shipments moved ■on bills of lading involved in the present suit. The latest date that a deduction was made on account of the demurrage charges involved in the present suit was August 14, 1958.
counterclaim:
30. Basis of counterclaim. Defendant is asserting a counterclaim against plaintiff in an amount of $12,996.69. Of this amount, $8,756.36 arises out of defendant’s claim that it is entitled to lower line-haul charges on certain of the *255 shipments by combining the rates named in TCFB Section 22 Quotation 13-A with certain tariff rates designated on defendant’s Schedule A-l. The shipments on which defendant is claiming this combination of charges are numbered by bill of lading as follows:

Bill of laMng Amount of counterclaim

WT 7531853. $1, 566. 58
WT 7531854. 1, 566.58
WT 7531855. 1, 566.58
WT 7531857. 1, 566.58
WT 7531858. 1, 566.58
WT 7531856. 543.77
WT 7437757. 238. 81
WT 7437755. 140.88
Total_ 8,756.36
The difference between said $8,756.36 of defendant’s counterclaim and the total counterclaim of $12,996.69 (said difference being $4,240.33) resulted from a recomputation of the line-haul tariff rates by defendant, which plaintiff agreed by stipulation it owed defendant.[7] The portion of said counterclaim, based upon combining Section 22 Quotation 13 series with tariff rates is disputed by plaintiff.
31. Origins and rates claimed. The shipments on which defendant is combining a rate named in Section 22 Quotation 13-A with tariff rates originating at Bellemont, Arizona, moved over the route of the Atchison, Topeka and Santa Fe to Stockton, California; Southern Pacific to Portland, Oregon; thence via the plaintiff’s line from Portland to Gold Bar.
For these shipments defendant constructs a through combination rate to Gold Bar over this route of movement by applying the Section 22 Quotation 13-A rate from origin to Stockton, California ($2.73 per cwt.), plus a tariff rate published and on file with the Interstate Commerce Commission named in Pacific Freight Tariff Bureau Tariff 1-S from Stockton to Seattle ($1.05 per cwt.), and plus a tariff rate published and on file with the Interstate Commerce Commission named in North Pacific Coast Freight Bureau Tariff 22~J from Seattle to Gold Bar (48 cents per cwt.).
*256 32. Section M Quotation 13-A. By letter dated July 8, 1943, railroads party to Consolidated Freight Classification 15 (including plaintiff and its connections) through, the Trans-Continental Freight Bureau (their agent) quoted and offered to the United States, under Section 22 of the Interstate Commerce Act, certain rates and charges to be applied on shipments of ammunition and explosives. This rate tender, entitled T.C.F.B. Section 22 Quotation 13-A, canceled a previous quotation entitled T.C.F.B. Section 22 Quotation 13, which had been issued on August 29, 1942. By amendment No. 10 to Quotation 13-A, dated January 17, 1950, the provisions of that quotation were reinstated as of January 1, 1950, and continued in effect up to January 1, 1951. Said Quotation 13-A provided in pertinent part as follows:

ITEM NO. 1. TRAFFIC COVERED

The traffic covered by and subject to this quotation is the commodities listed in Item No.. 2 when originating at and consigned to points within Mountain Pacific and Pacific Coast territory other than covered by Mr. A. F. Cleveland’s Section 22 Quotation No. 1A-A of December 7,1942 and amendments thereto.
ITEM NO. 2. LIST OF COMMODITIES
Ammunition, explosive, incendiary or gas, smoke or tear producing, viz.:
Ammunition, fixed or semi-fixed, for cannon;
Bangalore Torpedoes;
Bombs, Mines or Depth Charges;
Boosters, Bursters, Detonating Fuzes or Detonators;
Cartridge Cases, Camion, empty primed ;
Fuzes, combination, percussion, tracer, time or mine;
Grenades, hand or rifle;
Percussion Caps;
Primers;
Projectiles;
War Heads.
Gases, poison.
Grenades, hand or rifle, practice.
Torpedoes, aircraft or submarine, without explosives, self-propelling.
Explosives, viz.:
Caps, blasting or electric blasting;
High Explosives, noibn herein;
Low Explosives, including black powder;
*257 Nitro-cellulose, dry;
Nitro-starch, dry;
Picric Acid;
Safety Squibs;
Smokeless Powder;
Tri-Nitrotoluol ;
Wet Fulminate of Mercury.
Military Pyrotechnics or fireworks.

ITEM NO. S. BATES TO BE APPLIED

Subject to compliance with all the terms and conditions of this quotation on each carload shipment of the kind referred to in Item No. 2, the railroads will apply rates as shown in Exhibit “A” attached hereto, subject to minimum weight of 50,000 pounds.

ITEM NO. i. ROUTING AND CIRCUITY LIMITATIONS

The rates as provided herein apply to short-line mileage via routes authorized in current class rate tariffs and subject to all circuity and other restrictions applicable to such class rate tariffs.

ITEM NO. 5. LAND-GRANT DEDUCTIONS

No rate or charge applicable on any shipment moving under this quotation shall be subject to any land-grant deduction,

ITEM NO. 6. CHARGES AND ALLOWANCES

Shipments made under this quotation are subject to all charges and all allowances for or in respect of diversion, reconsignment, arbitrarles, demurrage, inspection, switehing, and to all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment or which increase or decrease the value of the service, without, in any case, any land-grant deduction.
ITEM NO. 7. PAYMENT OP CHARGES
All charges, including diversion, reconsignment, and/ or switching charges, if any, will be paid by the Government promptly upon presentation of bills therefor.
ITEM NO. 8. TERMINATION OF QUOTATION
This quotation may be cancelled by written notice of not less than sixty (60) days mailed by either party to the other except as to shipments made from original point of shipment before the effective date of such notice and except as to any accrued rights and liabilities of either party hereunder.

*258
ITEM NO. 9 ACCEPTANCE OF QUOTATION

This quotation when accepted by the United States Government by making any shipment under the terms hereof or otherwise, will constitute an agreement between the parties hereto as to the transportation services herein described.’
33. No single factor through rate a/ppliedble. Section 22 Quotation 13-A contained a distance scale of rates progressing upward in proportion to the distance a shipment moved under the quotation. It named rates for hauls moving up to and including 1,500 miles, but named no rates for hauls beyond 1,500 miles. The total rail distance from Bellemont, Arizona, to Gold Bar, Washington, via the route of movement was about 1,696 miles. No single factor through rate, tariff or otherwise, applied from Bellemont, Arizona, to Gold Bar, Washington, via the route of movement on this traffic during the times of shipment herein.
34. Tariff Circular No. W. At the time the shipments involved herein were made, there was in effect and published a circular of the Interstate Commerce Commission called Tariff Circular No. 20, which set forth “Rules to Govern the Construction and Filing of Freight-Rate Publications Including Pipe-Line Schedules and Classifications”. These rules, denominated “Administrative Rulings”, contained the following:
(c) Rates for through shipments are often made by adding together two or more rates. All rates used in making combination through rates for interstate shipments, including rates between points in one State, must be filed with the commission and posted at stations and can only be changed as to such traffic in accordance with the terms of the act.
# ^ ❖ #
55. (a) A rate named from origin to destination only legal rate. — When a rate, whether local or joint, from point of origin to destination, has been established via a route, it becomes the only legal rate for through transportation via that route, whether it is greater or less than the aggregate of intermediate rates.
(b) If no rate is named from point of origin to destination of a shipment via the route of movement, the lowest combination of rates applicable via the route of movement is the legal rate.
*259 A combination rate for a through shipment must be treated as a unit from point of origin to final destination, and the rate applied must be the combination of the factors in effect on the date the shipment was accepted for transportation at point of origin. All of the conditions applicable to each factor in such combination rate for through shipment in effect on the date the shipment was accepted for transportation at point of origin must be observed and can not be varied as to that shipment during the period of its transportation to final destination.
• 35. Applicability of combination through rate. Since there was no single factor through rate applicable between Bellemont, Arizona, and Gold Bar, Washington, on the shipments involved in the defendant’s counterclaim at the time of the movement, it is necessary to construct a combination through rate via the route of movement. The lowest combination of separately established published tariff rates on file with the Interstate Commerce Commission between Bellemont, Arizona, and Gold Bar, Washington, is constructed by adding a rate published by Pacific Coast Freight Bureau Tariff No. 26-U from Bellemont, Arizona, to Stockton, California, to a rate published in Pacific Freight Bureau Tariff No. 1-S from Stockton, California, to Seattle or Interbay, Washington, to a rate published in North Pacific Coast Freight Bureau Tariff No. 22 from Interbay, Washington, to Gold Bar, Washington.
In constructing the rates used in the defendant’s counterclaim, the Government substituted the rate named in A.A.E. Section 22 Quotation 13-A for the rate published in Pacific Coast Freight Bureau Tariff No. 26-U for that portion of the combination from Bellemont, Arizona, to Stockton, California. A.A.R. Quotation 13-A was in effect during the time of the movement and provided rates on high explosives, the commodity shipped under the bills of lading involved in defendant’s counterclaim between Bellemont, Arizona, and Stockton, California. However, the plaintiff contends that the defendant relied upon Eule 5-B of plaintiff’s Diversion and Eeconsignment Tariff which provides as follows:
Except as provided in paragraphs (c) or (d) of this rule, if, after car has had one change in destination after leaving the initial billing point, the destination is *260 again changed upon request of consignor, consignee, or owner, the shipment will be treated as a new shipment from the point at which the second or subsequent change in destination is accomplished and will be subject to the tariff rates to and from such point applicable on a shipment terminating at and on a shipment originating at such point, plus all charges previously accrued.
86. Comptroller General's decision. On October 9, 1951, the Assistant Comptroller General of the United States issued a decision (B-98076), respecting the right of the Government to combine tariff rates with rates named in a Section 22 Quotation. In this decision, he stated:
It is your contention that the requirement for the collection of charges computed through the application of such joint through tariff rate cannot be defeated or obviated through the use of a combination rate, comprising as one factor a section 22 quotation rate. Thus you state:
_ “The company’s position is that when there is a published through rate between the points of origin and destination of a through movement, that published through rate may not be defeated by a ‘combination’ rate made by combining a section 22 rate for a part of the through movement and a published rate or rates for the remainder of the movement.”
Section 22 of the Interstate Commerce Act, as amended, 49 U.S.C. 22, provides:
“Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States * * * or the transportation of persons for the United States Government free or at reduced rates * *
There is nothing in this expression of legislative permission that restricts the extent or controls the manner in which carriers may afford or accomplish, a reduction in charges to the United States. Admittedly and obviously a reduced rate may be given for application from a point of origin to a point of destination of any interstate movement, and it is not apparent why, if for any reason carriers should elect to afford a reduction for only a part of the through movement, such reduction is not authorized under the terms of the above statute. * * *.
*****
It does not appear, therefore, that the existence of a joint through tariff rate necessarily precludes the ap *261 plication of a reduced section 22 rate in combination with a tariff rate, if the carriers elect to afford the Government the benefit of a reduction in the through charges so accomplished.
In the instant matter, however, the reduced rates used in the audit were tendered in quotations — AAR section 22 Quotation No. 560 and Colorado-Utah Freight Bureau section 22 Quotation No. 1 — which quoted specific rates for application on described traffic from definitely named points to definitely named points, the route or distance between which constituted only a part of the through routes or distances traversed by the shipments involved. There has been noted nothing in said tenders which fairly may be taken as justifying the use of those quoted rates except as in place of higher tariff rates, authorized under the terms of the tariffs publishing them, for application to movements between the points named in the quotations. In the instant matter the publication of a joint through tariff rate, applying from the point of origin to the point of destination of the movement, precluded the use, independently of authority contained in the tariff publishing the through joint rate, of a combination of tariff rates made over the point or points designated in the quotations. That being true the use of the quotation rate in combination with a tariff rate or rates over said points is not authorized.
In conformity with the foregoing, the above-mentioned bills will be re-examined and such adjustment as may be found necessary on the basis of rates other than those provided in the designated quotations will be effected. Any amounts which may be found due on the revised basis will be certified for payment to the carrier.
stipulation as to damages
37. If plaintiff prevails. If the court should hold that the involved shipments are subject to 24 hours’ free time, as contended by the plaintiff, plaintiff is due the amount of demurrage charges claimed on its Schedule A annexed to the petition herein ($24,494.90 less $20 barred by the statute of limitations), less any amount determined to be due defendant on its counterclaim and less any amounts which the court shall deem barred by a prior judgment.
Defendant’s total counterclaim is $12,996.69, of which amount plaintiff admits $4,240.83 is due defendant. The issue involved in the remainder of said counterclaim *262 ($8,756.36) is whether defendant is entitled to combine a tariff rate with a rate named in Section 22 Quotation 13-A, to construct a combination through rate.'
If plaintiff is held barred from a portion of its demurrage claim by reason of the prior judgment in Court of Claims No. 10-59, plaintiff’s total claim for demurrage would be reduced by $11,168.28 as shown on defendant’s Schedule A-2 annexed to defendant’s response to plaintiff’s request for admissions.
38. If defendant prevails. If defendant prevails on its theory that it is entitled to ten days’ free time, plaintiff would be entitled to recover $682.
If defendant prevails on its counterclaim, defendant would be due $12,996.69 less $682, or a net amount due defendant of $12,314.69.
If defendant prevails on its counterclaim and plaintiff prevails on its demurrage charges, plaintiff would be due $11,478.21 less the amount barred by the prior judgment in Court of Claims No. 10-59 ($11,168.28) or a net amount-due plaintiff of $309.93.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on its claim in the sum of $24,474.90 and defendant is entitled to recover in part on its counterclaim in the sum of $4,240.33. Offsetting one against the other, it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of twenty thousand two hundred thirty-four dollars and fifty-seven cents ($20,234.57).

 Great Northern Railway v. United States, Ct. Cl. No. 10-69, order entered July 31, 1959.

 See finding 34 in Union Pacific Railroad Company v. United States, 132 Ct. Cl. 213, 243, 244, where it appears that prior to the Korean conflict the Office of Chief of Transportation supplied the Association of American Railroads with a code translation. However, there is no showing in the Instant case that this code translation was applicable.

 Defendant contends this to be inapplicable because, the bills of lading were marked “for export”.

 Presumably the contentions of the respective parties will be argued more fully In their ultimate briefs to the court, but they are presented here In shortened form because the parties requested findings as to contentions, and because they provide foci for the other reported facts.

 Note that plaintiff notified defendant of arrival at Gold Bar (finding 8, supra).

 Plaintiff contends the second so-called diversion to have been a reshipment.

 Of course, no part of defendant’s counterclaim is valid if these shipments are through movements to MuMlteo routed via Gold Bar.