**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY,**

v.

**The UNITED STATES.**

**No. 29–70.**

United States Court of Claims.

April 16, 1971.

Richard J. Schreiber, attorney of record, for plaintiff.

Joseph F. DiStefano, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge:

This transportation case comes before the court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. Plaintiff seeks to recover $405 which it alleges to be the amount of demurrage charges due to it for the period from November 1966 through June 1967, in accordance with its published tariffs filed with the Interstate Commerce Commission.

I

The pertinent facts are not in dispute. Plaintiff, an Illinois corporation, is a common carrier by railroad engaged in interstate commerce over its own lines and jointly with other common carriers. Plaintiff is a member of the Associated Railroads which is composed of the Colorado and Southern Railway Company; the Chicago, Burlington and Quincy Railroad Company; the Chicago, Rock Island and Pacific Railroad Company; the Denver and Rio Grande Western Railroad Company, and the Atchison, Topeka and Santa Fe Railway Company.

The Associated Railroads serve the Denver Federal Center, a General Services Administration facility, located within the Denver, Colorado, switching limits. Theoretically, each of the five member carriers switch cars to the Center for a one-year period. In practice,

the Colorado and Southern switches cars for three years (one year for itself, one year for plaintiff, and one for the Santa Fe) and the Rio Grande switches for two years (one year for itself and one year for the Rock Island).

On March 17, 1966, the Rio Grande began its two-year turn. Shortly thereafter representatives of the Colorado and Southern, the Rio Grande, and the GSA met to discuss damaged freight. During the meeting, the Colorado and Southern representative stated that the Colorado and Southern did not require the GSA to move empty cars from the GSA Depot to the interchange track (on the north side of the Center) on Tuesdays and Thursdays, as the railroad did not come out to the Center on those days to switch cars. At that point the Rio Grande representative stated that it would also permit the empty cars to be released at the GSA Depot. Defendant concurred in this arrangement, because it would save defendant the expense of moving the empty cars to the interchange track to be released on the days when they would not be picked up.

For the next 15 months, on Mondays, Wednesdays and Fridays, the cars were unloaded and then released by notification to the Rio Grande Switch Clerk. The cars were then taken to the interchange track on the same day. On Tuesdays and Thursdays cars unloaded and released were left on the track adjacent to the Depot until the switch on the following day. Throughout this period a Rio Grande checker confirmed on a daily basis that the released cars were in fact empty and available. The limited incidents of demurrage incurred by defendant were paid immediately by the GSA. At no time did the Associated Railroads assess demurrages for cars re-

leased at the Depot on Tuesdays and Thursdays.

In June of 1967, defendant was notified that henceforth all cars would have to be released at the interchange track.[1] Defendant was informed that the Western Weighing and Inspection Bureau had audited GSA's demurrage bills and demanded that the carriers assess demurrage for those cars which had not been moved to the interchange track on Tuesdays and Thursdays.

An informal meeting was held some months later between representatives of each of the five railroads and the GSA. It was agreed that demurrage bills covering the period prior to March 17, 1966, and subsequent to June 30, 1967, if valid, would be certified and paid. Secondly, the GSA would submit a request for a Section 22 Agreement waiving collection of demurrage charges alleged to have accrued between March 17, 1966 and June 30, 1967. The GSA was orally advised that the request would be granted.

A formal request for a Section 22 Agreement was made on June 16, 1969. It has neither been approved nor denied.

Plaintiff's first contention is that the demurrage charges provided for in the published tariffs must be adhered to strictly. Plaintiff argues that these charges are not a matter of contract and consequently may not be modified by either party. For this reason, plaintiff asserts that the representative from Rio Grande could not waive or modify the charges. Plaintiff relies on Pennsylvania R. R. Co. v. Moore-McCormack Lines, Inc., D.C., 246 F.Supp. 143 (1965), aff'd, 2 Cir., 370 F.2d 430 (1966) and Sinclair Ref. Co. v. Schaff, 8 Cir., 275 F. 769 (1921).

Plaintiff also argues that 49 U.S.C. § 22(2) (1964)[2] requires that a Section

---

1. Since receipt of the notice the cars have been moved daily to the interchange track and released.

2. The relevant portion of 49 U.S.C. § 22 provides:

"(2) All quotations or tenders of rates, fares or charges under paragraph (1) of

this section for the transportation, storage, or handling of property or the transportation of persons free or at reduced rates for the United States Government, or any agency or department thereof, *including quotations or tenders for retroactive application whether negotiated or renegotiated after the services have been*

22 Agreement be in writing and filed with the Interstate Commerce Commission. Since the prerequisites for a valid Section 22 Agreement have not been met, plaintiff contends that the demurrage charges must be paid by defendant in accordance with the provisions of the published tariffs.

Defendant contends that the provisions of 49 U.S.C. § 22(1) [3] permit a carrier to modify its published tariff rates when performing transportation services for the Government, pursuant to a Section 22 Agreement.

Defendant's principal argument is that in light of the circumstances, plaintiff is estopped from either collecting the additional demurrage charges or asserting that a valid retroactive Section 22 Agreement did not come into effect. Defendant contends that it relied to its detriment on the representations of plaintiff's agent when it agreed to the modifications regarding the release of the cars at the Depot as suggested by the Rio Grande representative in March of 1966. Defendant also asserts that it has made every attempt to have the agreement confirmed in writing.

Plaintiff admits that the Government may raise the defense of estoppel by claiming its reliance and detriment upon a particular rate quotation by a carrier. However, plaintiff takes the position that there is no authority for holding that the carrier is estopped to claim that the rate relied upon by the Government is unlawful or inapplicable.

## II

■ We find plaintiff's arguments unpersuasive and conclude that plaintiff is estopped from recovering the additional demurrage charges claimed. It is well established that the Government may invoke the defense of estoppel to prevent a carrier from recovering additional charges where the carrier has caused the Government to rely to its detriment on a lower rate. In United States v. Western Pacific R. R., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), the Supreme Court stated:

* * * Nor, unlike the case of a private shipper, do we think that the defense of estoppel is unavailable to the Government. See 49 U.S.C. § 22. *Cf.* Oregon-Wash. R. & N. Co. v. United States, 255 U.S. 339 [41 S.Ct. 329, 65 L.Ed. 677]; Western Pac. R. Co. v. United States, 255 U.S. 349 [41 S.Ct. 332, 65 L.Ed. 671].[20]

* * * * * *

20. A private shipper may not invoke the defense of estoppel to prevent a carrier from collecting a higher applicable tariff rate than that which may have been actually quoted by the carrier. This results from § 6(7) of the Interstate Commerce Act, 24 Stat. 380, as amended, 49 U.S.C. § 6(7), forbidding departures from the published tariff. See Pittsburgh, Cincinnati, Chicago & St. Louis R. Co. v. Fink, 250 U.S. 577, 583 [40 S.Ct. 27, 63 L.Ed. 1151]. The same considerations do not obtain when the Government is the shipper, in view of § 22 of the Act, 24 Stat. 387, as amended, 49 U.S.C. § 22, providing that "nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States." [352 U.S. at 76, 77 S.Ct. at 171.]

■■ We believe that the facts of this case are sufficient to establish the defense of estoppel. Plaintiff does not contest the authority of the Rio Grande representative to act for the Associated Railroads.[4] It is shown by the uncontro-

performed, shall be in writing or confirmed in writing and a copy or copies thereof shall be submitted to the Commission by the carrier or carriers offering such tenders or quotations in the manner specified by the Commission * * *."
[Emphasis supplied]

3. The relevant portion of 49 U.S.C. § 22(1) provides:

"Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, * * *"

4. Although plaintiff asserts that neither party could modify the published tariff rates, there is no contention that the Rio Grande representative could not act for all of the member carriers during its turn at serving the Center.

**1228**

verted affidavits in support of defendant's motion for summary judgment that defendant relied to its detriment on the representations of plaintiff's agent. Defendant's reliance was not unjustified, because a carrier need not abide by its published rates when dealing with the Government. Great Northern Ry. Co. v. United States, 312 F.2d 901, 903, 156 Ct.Cl. 332, 335 (1962), and the practice of retroactively confirming in writing a variation from the published tariff rate is permitted by 49 U.S.C. § 22(2) (see footnote 2 *supra*). Defendant has also demonstrated that it could and would have moved the empty cars to the interchange track on a daily basis had it not been for the agreement reached at the March 1966 meeting. Thus, we find no meaningful distinction between the facts in this case and those upon which the Supreme Court based its decision in United States v. Western Pacific R. R., *supra*.

■ The conclusion that plaintiff should be estopped from collecting additional demurrages here is also supported by the course of dealing between the parties during the period from March 1966 through June 1967. Plaintiff had full knowledge of the method used to release cars and assess demurrages. At no time did plaintiff protest the oral agreement made by its agent or attempt to assess the demurrages it seeks in this suit. This acquiescence lends support to the view that at that time, plaintiff believed the arrangement beneficial to its own interests. Consequently, plaintiff should not now be permitted to disavow the agreement. Oregon-Washington R. R. v. United States, 255 U.S. 339, 345–348, 41 S.Ct. 329, 65 L.Ed. 677 (1921). *See also* Jet Forwarding, Inc. v. United States, 437 F.2d 987, 194 Ct.Cl. —— (decided February 19, 1971).

### III

Defendant's motion for summary judgment is granted. Plaintiff's motion for partial summary judgment is denied and the petition is dismissed.