**JETCO, INC.**

v.

**The UNITED STATES.**

**No. 709–85C.**

United States Claims Court.

March 2, 1987.

Harold G. Hernly, Jr., Alexandria, Va., attorney of record for plaintiff. Paul A. Owens, John R. Sims, Jr., and Daniel B. Clark, of counsel.

Ronald A. Schechter, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, attorney of record for defendant. James Armstrong, Dept. of the Army and Michael Ettner, General Services Admin., of counsel.

## OPINION

LYDON, Judge:

This transportation case comes before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. This case presents the question of whether the actual intended rate charged the government for transportation services by a common carrier, which was established under a "section 22"

tender, must give way to a higher, unintended rate under the "filed rate doctrine." Both parties assert there are no genuine issues of material fact in dispute and that summary judgment is appropriate in this case. For the reasons stated below, after careful consideration of the submissions of the parties and oral argument, the court concludes that defendant's cross-motion for summary judgment should be granted.

### Preliminary Statement

The plaintiff in this case is Jetco, Inc. (Jetco), a Virginia corporation that is a common carrier. Jetco provided transportation services to the Military Traffic Management Command Department of the Army (MTMC) from July 18, 1983 until February 19, 1986. In 1985 the General Services Administration (GSA) notified Jetco, after an audit, that it had overbilled MTMC for its services (the overcharge claim). Jetco denied that it was guilty of any overcharging. It also informed GSA, upon rechecking its invoices to MTMC, that, in fact, it had *undercharged* MTMC for its transportation services (the undercharge claim). GSA held to its original position that Jetco had overcharged MTMC and asserted that Jetco had not undercharged MTMC. The final position of the GSA was stated in a letter dated November 27, 1985 to plaintiff's counsel.

In response to the GSA's final position, on December 5, 1985, plaintiff filed a complaint in this court which initiated the present action. Originally, plaintiff's complaint requested the following: (1) an injunction to prevent the GSA from setting off or deducting "for any and all of the amounts due and invoiced initially by Jetco", (2) a declaration that Jetco had undercharged MTMC for its services, (3) a judgment for $54,851.84 plus interest and costs (4) "other appropriate relief".[1] On the

---

1. Although not crystal clear in the complaint, other submissions from the parties show that the GSA had begun to setoff amounts by which it claimed Jetco had previously overcharged MTMC from current amounts due Jetco as Jetco continued to provide transportation services for

MTMC. Presumably, the requested injunctive relief was intended to prevent GSA from continuing this practice and the requested monetary relief represented the amount that the GSA had already deducted pursuant to the above described procedure. However, the complaint

same day that it filed its complaint, plaintiff also filed an application for a temporary restraining order (TRO). By the TRO, plaintiff sought to prevent the GSA from setting off or deducting for alleged overcharges from its account for 10 days or until a determination was made on its request for a preliminary injunction.

In an unpublished order dated December 6, 1985, the court denied plaintiff's application for injunctive or declaratory relief for lack of jurisdiction. To the extent the complaint sought money damages arising out of contracts or agreements with MTMC, the court held it had jurisdiction. The parties have settled the overcharge claim. Therefore, the basic overcharge claim is no longer before the court.[2]

On August 12, 1986, plaintiff filed its motion for summary judgment on the undercharge claim and on its claim that it was entitled to interest on the money withheld by the GSA and the amount by which it undercharged MTMC. By its motion, plaintiff seeks a "Declaratory Judgment Order" specifying the rates which should be used to determine the cost of the transportation services it provided MTMC. In billing MTMC originally, Jetco had calculated the cost of its services based on rates expressed in fractions of a cent (cents per mile per 100 pounds (cents rate)). It now claims the rates should have been in fractions of a dollar and cent (dollars and cents per mile per 100 pounds (dollars and cents rate)). Using this latter rate would obviously result in an increased rate. *See* Facts portion of this opinion, *infra.* Plaintiff wants this court to declare that the rates expressed in fractions of a dollar should have been used in billing MTMC originally so that it can now rebill MTMC and recoup the amount by which it feels it has undercharged MTMC, i.e., the difference between billing on a fraction of a cent

basis and billing on a fraction of a dollar basis.

As has already been pointed out, in its order of December 6, 1985 the court dismissed plaintiff's complaint insofar as it sought declaratory relief. However, plaintiff, in its motion for summary judgment, once again seeks declaratory relief, i.e., a "Declaratory Judgment Order." Indeed, this requested relief is consistent with the tone and language of plaintiff's complaint in that the only requested relief in the complaint relative to the undercharge claim is that the court "declare" that Jetco undercharged MTMC for its services. Technically speaking, in its motion for summary judgment plaintiff stylistically is requesting declaratory relief even though this court has already ruled that such relief is beyond its jurisdiction.

Although awkwardly stylized, the court finds that plaintiff's complaint and motion for summary judgment can be read as seeking a money judgment. In essence what plaintiff is seeking is the difference between the amount of money it received from MTMC for transportation services performed from July 18, 1983 to February 19, 1986[3] by billing at rates expressed in fractions of a cent and what it would have received if it had billed at rates expressed in fractions of a dollar. According to plaintiff's most recent submission referring to money that difference is $170,974,407.82. In substance, plaintiff in its complaint and in its motion for summary judgment, seeks a money judgment for $170,974,407.82 from defendant. Such a money claim is within the jurisdiction of this court.

Plaintiff's motion also seeks an award of interest on both the overcharge and the undercharge claims. As mentioned above, the parties have been able to settle the overcharge claim as to the principal amount. Although plaintiff originally re-

did state that Jetco had received overcharge notices in excess of $300,000.

2. This settlement applied only to the principal amount of the alleged overcharges. The issue of whether or not plaintiff was entitled to interest on the amounts withheld by the GSA was not

settled and is presently before the court. *See also* note 8, *infra.*

3. Plaintiff claims that rates which are expressed in fractions of a dollar were in effect from July 18, 1983 to February 19, 1986.

quested $54,851.84 in its complaint, it now reports in its brief that under the settlement agreement, GSA will be remitting almost $400,000 which it had offset. The court assumes that Jetco, through its motion, now asserts that it is entitled to interest on this entire settlement amount, not just the $54,851.84.

The court has discussed above the problem of format and style with respect to the undercharge claim. The court has viewed plaintiff's undercharge claim as requesting a money judgment of approximately $170 million. Consistent with that reading of plaintiff's claim, the court views plaintiff's interest claim on the undercharge as one for interest on the approximately $170 million by which plaintiff claims it was underpaid by MTMC for its transportation services.

### Facts

On June 1, 1983, Jetco issued what is known in the transportation industry as a "section 22" tender.[4] Jetco's tender, numbered 108–A, was to take effect on July 1, 1983. The rates contained in tender 108–A were to be used for computing the charges of Jetco's transportation services which it furnished to MTMC. In the tender, the rates were set forth in item 2000, which was found on page 7 of the June 1, 1983, effective July 1, 1983, tender (sometimes referred to as the original tender).

Jetco's tender 108–A was modified by a revision which was issued on July 14, 1983 and became effective on July 18, 1983. This revision contained two modifications which are relevant to the present case. One involved the addition of a new item to the tender and the other involved some alterations to an existing item. Jetco introduced a second series of rates found in item 3000 at page 8 of the original tender. In affidavits dated February 18, 1986 and August 8, 1986 Ronald J. Young (Young), Jetco's Executive Vice President in 1983, explained why the new rates were included in the tender. He stated that the majority of the MTMC traffic that Jetco handled weighed under 10,000 pounds. However, under the item 2000 rates the shipping costs were based on a minimum weight of 24,000 pounds. The item 3000 rates were established to provide rates based on minimums of 5,000 pounds, 8,000 pounds and 10,000. Under the July 14, 1983 revised tender, item 3000 furnished the "less than truckload rate." According to Young, shipments under 10,000 pounds are commonly viewed as "less than truckload" in the industry.

The other modification involved alterations to item 2000. Note 2 of item 2000 was changed to state the rates contained within item 2000 applied to intrastate shipments in Maryland and Virginia. Previously, in the original tender, note 2 had stated that the rates applied to intrastate shipments in Virginia and West Virginia.

---

**4.** As a general rule, a carrier providing transportation services subject to the jurisdiction of the Interstate Commerce Commission (ICC) must file a tariff setting forth the rates it will charge for its services. A carrier generally may not charge a rate different from the one contained in the tariff filed with the ICC. 49 U.S.C. § 10761(a)(1982). However, a common carrier may provide transportation services to the United States government at a rate lower than the one set forth in the tariff. 49 U.S.C. § 10721(b)(1) (1982). By means of the so-called section 22 tender (named for the former code section allowing government rates), a common carrier may set forth (tender) the rates it will charge the government. There is a standard form on which such a tender may be submitted. Jetco did not use this form and, in fact, according to Allen W. Kirby (Kirby) who was the Chief, Transit and Tariff Branch, Negotiations

Division for MTMC, it submitted its rates in a "Jetco format". However, this submission did contain all the required information that would appear on a section 22 quotation standard form. Kirby's affidavit seems to suggest that since all the necessary information was contained in the quotation the fact the information was set down in a "Jetco format" and not on a form generally used for section 22 quotation was immaterial. This statement appears to be correct. The fact that the rates submitted were lower than plaintiff's published tariff rates was sufficient to constitute a section 22 quotation under the circumstances of this case. *See United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 75–76, 77 S.Ct. 161, 171–72, 1 L.Ed.2d 126 (1956). *See also Baggett Transportation Co. v. United States,* 229 Ct.Cl. 428, 429–31, 670 F.2d 1011, 1012–13 (1982); *see also* concurring opinion of Nichols, J. 229 Ct.Cl. at 432–33, 670 F.2d at 1013–14.

Included in the original tender, at original page 3 and still in effect at the time of the modification described above, was a list of abbreviations and reference marks applicable to the tender. According to this list a diamond mark indicated that a change in rates had been made. A triangle mark indicated a change in wording had been made which did not result in a price increase. In the July 14, 1983 tender modification, note 2 of item 2000 was annotated with a triangle indicating a change in wording with no change in rates relative to the original (June 1, 1983) tender.

In the original tender of June 1, 1983, page 7 read in pertinent part as follows:

### Section 3

### Distance Commodity Rates

(In cents Per Mile, Per 100 Pounds)

\*      \*      \*      \*      \*      \*

Note 2: Rates also apply on intrastate shipments in Va and WV.

In the July 14, 1983 tender modification, the first revised page 7 changed page 7, *supra*, of the original tender to read in pertinent part as follows:

### Section 3

### Distance Commodity Rates

(In Dollars and Cents Per Mile, Per 100 Pounds)

\*      \*      \*      \*      \*      \*

Note 2: Rates also apply on intrastate shipments in Md and Va.

As described above, a triangle mark indicated a change in wording but no change in rates. However, the parenthetical language under "Distance Commodity Rates" was changed as set forth above. The parties did not treat this parenthetical language as changing the rates called for in the original June 1, 1983 tender. The triangle mark next to Note 2 indicated no change in rates. If the parenthetical language, *supra*, were read to change the rates of the tender, it would represent a 100 percent increase in the rates MTMC was obligated to pay plaintiff for transportation services under the 108–A tender.

The materials at hand suggest that neither party attached any significance to the (new) parenthetical language until after the GSA in 1985 notified plaintiff that it had overcharged MTMC for its services under item 150 of the 108–A tender. *See* p. 848, *infra*. The language within the parenthesis, *supra*, and the triangle mark adjacent to Note 2 seem inconsistent, confusing and, at the very least ambiguous. The ambiguity seems patent.

Despite what might appear to have been a rate increase, created by the new parenthetical language, neither party treated it as such nor intended it to be such. Although, as discussed, *infra*, plaintiff's present claim centers on what it asserts was an effective rate increase, as a result of the July 14, 1983 modification, its behavior at the time of the modification and thereafter did not reflect this. Plaintiff continued to bill MTMC, calculating its charges on rates expressed in fractions of a cent, i.e., the "non-revised" rate. In his affidavits Young stated that the new parenthetical language rate change inserted in the July 14, 1983 modification was placed there "inadvertently". Plaintiff's moving brief, page 5, calls the July 14, 1983 rate change a "publication error." In its moving brief at page 11, plaintiff stated that the new rate was "mistakenly substituted" when first revised page 7 was published. As a result, it is not unreasonable to conclude that neither party intended a rate change when item 2000 was published.

According to Allen W. Kirby (Kirby), who was Chief, Transit and Tariff Branch, Negotiation Division (for MTMC) from October 1, 1982 to December 14, 1985 the change in the rate structure was not detected primarily because note 2 had been annotated with a triangle in the July 14, 1983 modification of tender 108–A. In his affidavit of September 29, 1986 Kirby explained the MTMC's process of tender review. Tender examination is performed by clerical grade examiners. The voluntary use of reference marks and abbreviations, which are not required in section 22 tenders, "speeds" MTMC's examination of

tenders and allows the clerical examiner to "quickly" find changes, especially those which increase the rates. Publication of the symbols leads MTMC to rely on the carrier to properly annotate, in a uniform manner, changes in the tender. Because note 2 was annotated with a triangle MTMC viewed the change as one which did not signify a rate increase.

It should be further noted that there was no notation next to the "Section 3, Distance Commodity Rates." Kirby states in his affidavit that the absence of any notation lead MTMC examiners to believe there were no other changes. This belief was only heightened by the fact that one change had been noted (correctly) which did not include a rate increase. Because the examiner relied on the notations the change in "Section 3, Distance Commodity Rates" was not noticed.

Thus, due to what Kirby asserts was the non use of a symbol, indicating change in the critical parenthetical language, i.e., (dollars and cents per mile, per 100 pounds), MTMC clerical examiners viewed the changes in item 2000 as only "territorial", i.e., simply changing note 2 from Virginia and West Virginia to Maryland and Virginia. No change in rate was perceived. Accordingly, "short notice" filing was acceptable.[5]

Finally, Kirby states that MTMC area command technicians, who examine rates for competitiveness, did not catch the changes in revised item 2000 for the same reasons that the tender examiners did not see it. Had Jetco noted the change to indicate a rate increase, notified MTMC of an increase, or billed MTMC at the higher rate, MTMC would have stopped using Jetco as a carrier. He claims this is because other carriers would have been available at lower rates and by regulation MTMC had

to contract with the carrier who would provide the lowest rate. Military Traffic Management Regulation § 202003(b)(2).

On September 30, 1983 MTMC issued a policy directive to carriers announcing changes in MTMC policy and procedure and telling carriers to make any necessary changes in their tariffs and/or tenders to bring themselves into compliance with the new directive by November 1, 1983. The policy directive provided that tenders offering rates in dollars or cents per mile could not be made subject to "Capacity Load Rules." Also, the directive prohibited the use of "Lineal Foot Rules." As of September 30, 1983 Jetco's tender 108–A had a lineal foot rule but did not have a capacity load rule. According to Young, having to remove the lineal foot rule from Jetco's tender would have had a very severe effect on it unless it was able to insert a capacity load rule in the tender. After negotiating with MTMC Jetco was allowed to insert a capacity load rule in its tender.[6] The capacity load rule is item 150 found at second revised page 4. The page was issued on October 26, 1983 and became effective on November 1, 1983.

In his affidavit Young explained how item 150, the capacity load rule, worked. In essence this rule was designed for situations in which one of Jetco's vehicles was full in terms of space but because of the type of material being transported the vehicle was less than full in terms of weight. Ordinarily a less than full truckload shipment, meaning a shipment below full weight capacity, was charged according to the rates set forth in item 3000. More than one less than full truckload shipment could be consolidated for transportation. However, when a less than full truckload was extremely bulky it would take up the entire vehicle and thereby prevent Jetco from consolidating more than one less than full

5. Kirby reports that for an increase in rates an advance notice of 30 days was required. For plaintiff's change, notice was only 4 days. First revised page 7 was issued July 14, 1983 and made effective July 18, 1983.

6. Jetco's capacity load rule was acceptable to MTMC because the rates in its tender were expressed in terms of cents (or dollars and cents) per mile, per 100 pounds. MTMC's prohibition on capacity load rules applied to those tenders whose rates were expressed only in dollars or cents per mile (with no reference to weight).

truckload shipment. When such a situation occurred, i.e., a vehicle was filled to "visual capacity" but not weight capacity, under item 150 the shipment was charged at the truckload rate, item 2000, at a minimum of 36,000 pounds.

Apparently Jetco continued to furnish transportation services for MTMC from November 1, 1983 until some time in 1985 without incident. However, according to the affidavit of Curtis R. Taylor (Taylor) Jetco's Vice President and Chief Operating Officer, in April of 1985 Jetco first began to receive notices of overcharge from GSA. These notices continued and, according to its complaint, by November of 1985 plaintiff had received over $300,000 worth of overcharge notices. Also, GSA began to setoff what it perceived as amounts overcharged by Jetco from the payments due Jetco for current services. Correspondence between Jetco and the GSA indicate that the alleged overcharges centered on the validity and use of item 150.[7] Ultimately, as indicated earlier, the overcharge issue was settled between the parties.[8]

In his affidavit, Taylor states that it was in September of 1985, during negotiations with GSA concerning the overcharge claims, that plaintiff first began to realize that it had undercharged MTMC for its transportation services. Plaintiff's undercharge claim is premised on the July 14, 1983 (effective July 18, 1983) tender modification in item 2000, "Section 3, Distance Commodity Rates", which stated the rates were in terms of dollars and cents per mile, per 100 pounds. Original item 2000 had stated the rates were in terms of cents per mile, per 100 pounds.

Plaintiff first took the position that "direct application" of item 2000, i.e., computing its bills on a dollars and cents basis instead of just a cents basis would result in an inordinately high rate for its services to MTMC. Therefore, as an alternative, Jetco said that it could charge MTMC according to rates contained in item 3000 of tender 108–A and the rates in Jetco's tariff 201–A (which applied to commercial traffic) in assessing the undercharge. This was the position taken by Young in his first affidavit. It was also the "position" of Thomas K. Ledman (Ledman), Jetco's tariff expert, in an "affidavit" (which was unexecuted) submitted by Jetco in its application for the TRO. Based on these alternative computations, plaintiff claimed entitlement to approximately $1.4 million.

The position of plaintiff then changed dramatically. Plaintiff now asserts that it cannot use an alternative rate theory, but instead must directly apply item 2000.[9] For all MTMC shipments from July 18, 1983 to February 19, 1986, the dates first revised page 7 was in effect, plaintiff now

---

**7.** The parties' submissions include letters written between plaintiff's counsel and Michael D. Hipple (Hipple), Director, Transportation Audit Division for GSA. Originally, it seems that GSA contended that item 150 was not valid under the MTMC policy directive of September 30, 1983. However, in his final letter, Hipple states that even if item 150 did satisfy the requirements of the policy directive, because Jetco's rates were expressed on a per hundred pounds basis, item 150 was nevertheless "ambiguous". Under the "ambiguous" provision plaintiff had not satisfied its burden of showing it was entitled to the rates it had changed. Col. Nelson Maier, Jr., General Staff Director of Inland Traffic for MTMC, stated that item 150 complied with the policy directive.

**8.** Defendant finally accepted the applicability of item 150 to all shipments made subsequent to November 1, 1983. Plaintiff reports that the settlement agreement required the GSA to re-turn almost $400,000 which it had setoff from Jetco's account. The issue of whether plaintiff is entitled to interest on the money withheld was not resolved and that issue is now before the court.

**9.** Plaintiff insists that it must change its position, i.e., argue for direct application of item 2000 and not the application of an alternative rate, because of defendant's response to plaintiff's request for admissions. Quite frankly, the court is at a total loss as to the basis for plaintiff's claim. It finds nothing in defendant's response which would require plaintiff to abandon its alternative rates theory. In its reply brief, plaintiff claims that the third issue identified by defendant in its response requires direct application of item 2000. The court finds that defendant was simply indicating several relevant issues in its response. In no way can this third issue be viewed as mandating direct application of item 2000.

contends it is entitled to the difference between what it received by billing MTMC on a per cents, per 100 pounds basis and what it should have received by billing on a per dollars and cents, per 100 pounds basis. In his second affidavit, Young states that an alternative rate should not be used. Likewise, in an affidavit dated August 11, 1986 Ledman also states item 2000 must be directly applied. On December 1, 1986 Jetco filed by leave of court its "Reply to Defendant's Cross Motion and Reply to Defendant's Reply to Plaintiff's Motion." In this submission, plaintiff's undercharge claim is reported as $170,974,407.82.[10]

*Discussion*

A. *Tariff law and the "section 22 tender"*

At the outset it is important to note that both plaintiff and defendant acknowledge that the changing of the rates in item 2000 from "cents" to "dollars and cents" was done inadvertently. However, their positions as to the consequences of this change differ radically. Plaintiff argues that although it never intended for its rates to be expressed in terms of dollars and cents, the law dictates that the parties must abide by the published rate. Therefore, plaintiff is "forced" to rebill MTMC at the higher published rate.[11] Defendant counters that it should not have to pay rates which it, and

plaintiff, never intended nor contemplated would be charged. It argues that the court should look past the erroneously published rates and utilize the original rates, which reflected the mutual intent of the parties and were followed without question until the GSA accused plaintiff of overcharging for its services.

■ A carrier providing transportation services subject to the jurisdiction of the Interstate Commerce Commission (ICC) must have in effect a tariff which specifies the rates it charges for those services. 49 U.S.C. § 10761.[12] The carrier must charge shippers only those rates specified in the tariff. *Id.* This policy prevents the carrier from discriminating against certain shippers. *Pittsburgh, Cincinnati, Chicago, St. Louis Railway Co. v. Fink*, 250 U.S. 577, 581, 40 S.Ct. 27, 27, 63 L.Ed. 1151 (1919).

■ The court agrees with plaintiff that as a general rule the published tariff rate of a carrier dictates what it must charge a shipper, regardless of any ignorance or misquotation of rates. *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, supra*, 250 U.S. at 581, 40 S.Ct. at 27. *See* 49 U.S.C. § 10761. Hereinafter, for convenience

10. In the December 1, 1986 brief plaintiff requests two alternative forms of relief. For its first alternative plaintiff requests that it be awarded $22,184,942.57. This figure reflects the undercharge on shipments from September 17, 1985 to February 19, 1986. Plaintiff claims that on September 17, 1985 it specifically called the GSA's attention to the "dollars and cents" rate contained in item 2000. Therefore, Jetco says, it cannot be estopped from claiming that the dollars and cents rate applied after September 17, 1985. As a second alternative, plaintiff requests an award of $1,469,343.21. This figure represents a return to computing the undercharge by using the alternative rates discussed, *supra*.

11. As reported, *supra*, note 10, plaintiff has made claims for alternative forms of relief. However, each of plaintiff's alternative claims rely on its primary contention that revised item 2000 is controlling. The "limited claim" on shipments from September 11, 1985 to February

19, 1986 is based on direct application of revised item 2000 to the shipments in that time period. The alternation of rates theory is premised on the claim that revised item 2000 rates apply, but that an alternative (lower) rate should be used in their place. Therefore, the court's rejection of plaintiff's contention that the rates in item 2000 have been revised by the substitution of "dollars and cents, per 100 pounds" for "cents, per 100 pounds" is fatal to plaintiff's alternative claims for relief as well as its primary claim.

12. Plaintiff is most accurately described as a "motor common carrier." 49 U.S.C. § 10102(12) (1982). The definition of "common carrier" includes "motor common carrier." 49 U.S.C. § 10102(4). Finally, the definition for "carrier" includes "common carrier." 49 U.S.C. § 10102(2). The prohibition of transportation without a tariff applies to all carriers. 49 U.S.C. § 10761.

sake, this rule that a carrier must strictly apply the rates published in its tariff will sometimes be referred to in this opinion as the "general rule." [13] However, the general rule is not applicable when dealing with the government. When conducting shipping business with the government a common carrier does not have to abide by its published (tariff) rates. *Chicago, Burlington & Quincy Railroad Co. v. United States*, 194 Ct.Cl. 688, 694, 439 F.2d 1224, 1228 (1971); *Great Northern Railway Co. v. United States*, 156 Ct.Cl. 332, 335, 312 F.2d 901, 903 (1962). A statutory provision allows a common carrier to provide its transportation services to the government at a reduced rate. 49 U.S.C. § 10721(b)(1).[14] The so-called section 22 tender "is a special exception to the * * * prohibition of discriminatory rates, permitting carriers to agree with the government to a lower rate schedule for government carriage." *Baggett Transportation Co. v. United States*, 229 Ct.Cl. 428, 429, 670 F.2d 1011, 1012 (1982).

In the present case the general rule is not controlling. First, plaintiff's rates were established by its section 22 tender, not a tariff. Plaintiff argues that a section 22 tender has the same "legal impact" as a tariff. It is true that a section 22 tender is viewed as a type of tariff. *See, e.g., Baggett Transportation Co. v. United States*, 162 Ct.Cl. 570, 577, 319 F.2d 864, 865 (1963). However, plaintiff has not demonstrated, nor has the court found any rule for section 22 tenders akin to the general rule for tariffs, i.e., the rates quoted must be strictly enforced.

Most of the case law cited by plaintiff involves fact situations in which a private party was the shipper. Although these cases confirm the general rule, they are not relevant to the instant action because they do not, and could not, involve a section 22 tender. Only the government can receive the benefit of a section 22 tender. *See Baggett Transportation Co. v. United States, supra*, 229 Ct.Cl. at 430, 670 F.2d at 1011. Plaintiff conceded at oral argument that the instant case was one of first impression and that he was not aware of any case where the filed rate doctrine was applied against the government where a lower section 22 rate was applicable or appropriate.

Therefore, the cases cited by plaintiff are all distinguishable from the present case. Plaintiff's citations are completely devoid of any case(s) which stand for the proposition that the rates of a section 22 tender, like those published in a tariff, must be fully controlling on and strictly enforced by the parties. In other words, plaintiff has not offered any authority to show that there is a rule for section 22 tenders parallel to the general rule for tariffs, i.e., the filed rate doctrine.

### B. *Estoppel*

The court finds that plaintiff is estopped from trying to charge defendant the dollars and cents rate. In *Chicago, Burlington and Quincy Railroad Co. v. United States, supra*, 194 Ct.Cl. at 693, 439 F.2d at 1227, the Court of Claims said, "[i]t

---

**13.** In its reply brief, plaintiff offers its definition of the "filed rate doctrine." This doctrine "forbids a regulated entity to change rates for services other than those properly filed with the appropriate federal regulatory authority." *Arkansas, Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). In other words, the "filed rate doctrine" can be viewed simply as a phrase used to express the general rule that a common carrier must charge the rates specified in its tariff. Plaintiff goes on to claim that a "filed rate" is a "quasi-judicial" contract, citing *Bowser and Campbell v. Knox Glass, Inc.*, 390 F.2d 193 (3d Cir.1968), *cert. denied*, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968) as authority. The court in *Bowser and Campbell* never referred to a "quasi-judi-

cial" contract. Its opinion examined the difference between a contract carrier and a common carrier and concluded that a contract carrier was also required, under the then existing statute, to charge the rates it filed with the ICC. *Id.* at 197. Thus, despite the terms used by plaintiff, the court finds that the general rule of law, simply stated, is that a carrier and shipper must abide by the rate established by the carrier's tariff.

**14.** This section applies only to common carriers, a type of carrier. *See* note 12, *supra*. Plaintiff is a common carrier. However, at times this opinion refers to plaintiff simply as a carrier.

is well established that the Government may invoke the defense of estoppel to prevent a carrier from recovering additional charges where the carrier has caused the government to rely on a lower rate." The government, as the shipper in *Chicago, Burlington,* paid the plaintiff carrier at a rate which the carrier asserted was below the published tariff rate. Relying on the general rule, the carrier sued the government for the difference between the published rate and the rate paid by the government. The court found that because section 22 allowed a carrier to charge the government at a lesser rate, strict application of the published tariff rates was not required and the government could set up the defense of estoppel. *Id.* at 693, 439 F.2d at 1227.

In its opinion, the Court of Claims cited the case of *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). In *Western Pacific* the Supreme Court said:

> [a] private shipper may not invoke the defense of estoppel to prevent a carrier from collecting a higher applicable tariff rate than that which may have been actually quoted by the carrier. * * * The same considerations do not obtain when the Government is the shipper, in view of § 22 * * * providing that "nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States."

*Id.* at 76 n. 20, 77 S.Ct. at 171 n. 20.[15]

In both *Western Pacific* and *Chicago, Burlington* the carriers' rates were established by tariff and not by section 22 tender.[16] Nevertheless, both the Supreme Court and Court of Claims held that the policy expressed in 49 U.S.C. § 22 (49 U.S.C. § 10721(b)(1)), i.e., the government could be charged at a lower rate, allowed the defendant to set up the defense of estoppel against application of full tariff rates. This policy should be all the more controlling in a case such as the present one where the rates are actually established by a section 22 tender. Certainly if the fact that the government *may* be charged a lesser rate makes estoppel available to it, estoppel should also be available to the government when it *is* being charged a lesser rate pursuant to a section 22 tender.

The Court of Claims' decision in *Chicago, Burlington* that plaintiff was estopped from collecting the published rate was based on the government's reliance on the plaintiff's representations of a lower rate and on the course of dealing between the two parties. *Id.* at 694, 439 at 1228. In the present case, plaintiff must be viewed as having represented to defendant that its rates would be on a per cents basis. This was the rate the parties agreed to and was implemented by the original tender. It was changed only by publication error, an error plaintiff concedes.

The course of dealing between the parties in this case likewise militates in favor of plaintiff being estopped from charging defendant at the dollar and cents rate.

---

15. In its reply brief, plaintiff claims that in 1957 *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) was overruled by statute. Plaintiff does not cite the statute but merely references certain legislative reports that deal, *inter alia,* with section 22 rates. As "authority" it cites *Arkansas-Louisiana Natural Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) and *United States v. Francis,* 320 F.2d 191 (9th Cir.1963). The court finds that neither of these cases in any way supports plaintiff's proposition. Neither case refers to the fact, if it is a fact, that the *Western Pacific* holding was overruled by statute. Plaintiff's claim is further disproved by the fact that in *Chicago, Burlington and Quincy Railroad Co. v. United States,* 194 Ct.Cl. 688, 439 F.2d 1224 (1971) the Court of Claims relied on *Western Pacific* as authority. *Chicago, Burlington* was reported in 1963, 6 years after the claimed 1957 statutory overrule of *Western Pacific.* The court rejects plaintiff's claim that *Western Pacific* has been overruled by statute or otherwise, thus, the government may indeed invoke estoppel. *Id.* 352 U.S. at 76, n. 20, 77 S.Ct. at 171, n. 20.

16. In *Chicago, Burlington* the government agency applied for a retroactive "Section 22 Agreement" which was available pursuant to the then existing statute. *See* 49 U.S.C. § 22(2) (1964). However, at the time the opinion was written in *Chicago, Burlington* the request for the section 22 agreements had neither been approved nor denied. *Id.* 94 Ct.Cl. at 692, 439 F.2d at 1226.

"There is no surer way to find out what parties meant, than to see what they have done." *Insurance Co. v. Dutcher*, 95 U.S. (5 Otto) 269, 273, 24 L.Ed. 410 (1877). Prior to the GSA audit and overcharge claim neither side ever envisioned utilization of the higher rate. Both sides admit the dollars and cents rate was published by accident. The parties conducted all business based on the original rate. This interpretation of the tariff, before it became the subject of controversy is entitled to weight and consideration. *See Inland Empire Builders, Inc. v. United States*, 191 Ct.Cl. 742, 755, 424 F.2d 1370, 1378 (1970); *Ling-Tempco Vought, Inc. v. United States*, 201 Ct.Cl. 135, 150–51, 475 F.2d 630, 639 (1973). It was not until more than 2 years after the per dollars and cents rate was published, by mistake, that plaintiff began to insist on its application and then only when GSA charged plaintiff with overbilling MTMC.

Plaintiff argues that at the very least it cannot be estopped from charging the higher rate on all shipments from September 17, 1985 to February 19, 1986 (the effective date of another revision of item 2000 which again expressed the rate in terms of cents). This claim is based on the fact that it was on September 17, 1985 that plaintiff specifically called to the attention of the GSA that its item 2000 rates had been expressed in terms of dollars and cents since the revision effective July 18, 1983. Therefore, plaintiff claims, because the GSA had been informed of the "published rate" the MTMC could no longer rely on its belief that the original (cents) rate governed. Plaintiff's argument misses the point.

Regardless of whether or not the publication error was pointed out to the GSA, MTMC and the GSA always believed that the per cents rate governed and also that plaintiff believed the per cents rate governed. Prior to the revelation of the publication error, this belief was confirmed by the fact that the original tender had expressed the rates in terms of per cents and that the parties conducted their dealings as if the per cents rates applied. Subsequent to disclosure of the publication error, all parties thought that the per cents rate

rightfully governed because all viewed the substitution of the different rate as a mistake. Plaintiff began to insist on collecting the per dollars and cents rate only because it thought it was required to do so by law. GSA and MTMC justifiably believed that plaintiff was wrong in its opinion that it had to collect the higher rate. Given plaintiff's position, GSA and MTMC would be further justified in believing that if it turned out plaintiff was not required to charge at the higher rate plaintiff would live up to its claim that it felt the parties always intended for the per cents rate to govern and the per dollars and cents rate had only been substituted by mistake.

Thus plaintiff is even estopped from charging the per dollars and cents rate by its conduct and position taken after it notified the GSA of its publication error. By asserting that it was charging the per dollars and cents rate *only* because it was required to by the general rule plaintiff lead defendant to believe that plaintiff felt, absent the general rule, the originally intended per cents rate should govern. Thus MTMC continued to ship with Jetco believing that if it was shown that plaintiff was not *required* by law to charge the per dollars and cents rate it would charge the per cents rate which it admitted was the mutually agreed upon rate. The position taken by plaintiff estoppes it from charging the higher rate once it is determined that it is not required to charge the higher rate.

### C. *Reformation*

■ Once it has been determined that plaintiff is not required to charge the per dollars and cents rate, i.e., the general rule does not apply, the court must reform plaintiff's erroneously published section 22 tender to reflect the rates that should be properly charged. Reformation is a remedy which is "intended to give relief from a contract which does not conform to antecedent expressions on which the parties have agreed." *Evans Reamer & Machine Co. v. United States*, 181 Ct.Cl. 539, 551, 386 F.2d 873, 880 (1967), *cert. denied*, 390 U.S. 982, 88 S.Ct. 1102, 19 L.Ed.2d 1279

(1968). *See also Bromion, Inc. v. United States,* 188 Ct.Cl. 31, 36, 411 F.2d 1020, 1022 (1969). The test for granting reformation, according to *Bromion,* is that "a court will not decree reformation unless it has convincing evidence that parties expressed agreement and an intention to be bound in accordance with the terms that the court is asked to establish and enforce." *Id.* at 36, 411 F.2d at 1023, quoting 3 Corbin, *Corbin on Contracts* § 614 (1960). The court feels it is appropriate to borrow this contract remedy for the present case. *See Baggett Transportation Co. v. United States, supra,* 162 Ct.Cl. at 577, 319 F.2d 868.

The facts of the instant case present a perfect situation for reformation. It is quite clear that when plaintiff's original tender first became effective on July 1, 1983 both parties intended that a per cents rate would apply to MTMC's shipments. When Jetco began to service MTMC, this intention was manifested by the fact that it calculated its charges to MTMC using a per cents rate. An amendment to the original tender, effective July 18, 1983 mistakenly expressed the item 2000 rates in terms of dollars and cents. Yet admittedly neither carrier nor shipper realized that a different rate had been published and neither intended that the existing (per cents) rate be changed. Shipping and billing continued with the per cents rate governing Jetco's charges. Most important, plaintiff in its submissions admits that "Jetco did not intend the [July 14, 1983, effective July 18, 1983] amendment to be a rate increase and intended to charge the Government for the shipments at issue in this case on a 'cents per mile' basis". (Plaintiff's response of December 1, 1986 to Defendant's Proposed Findings of Uncontroverted Fact, par. 4, filed October 3, 1986.)

After the GSA alleged that plaintiff had overcharged MTMC on an unrelated item under the tender, plaintiff then vocally surfaced the mistakenly published rate. Only then did plaintiff insist on its application. Yet plaintiff continues to acknowledge that the per cents rate was the rate originally intended by the parties and is the rate which should ordinarily be used by the parties. Plaintiff's self proclaimed only reason for insisting on the use of the per dollars and cents rate is its belief that it is required by statute to charge the higher rate.

Under the *Bromion* test this court must have "convincing evidence" that the parties intended and agreed to be bound by the per cents rate if it is going to reform the tender that was effective July 18, 1983 to February 19, 1986, to reflect that rate. Certainly one could not ask for more convincing evidence than the parties' own admissions. Both parties readily acknowledge that per cents was the originally intended and agreed upon rate and per dollars and cents was placed in the tender only by mistake. Prior to discovery of the publication error, the parties conducted their business as if the per cents rate governed. Subsequent to the discovery of the publication error, both sides continued to agree that they had always intended for the per cents rate to govern.

Having already rejected plaintiff's argument that it is "forced" by statute to use the dollars and cents rate, the court feels that it has the convincing evidence required to reform the tender to reflect what both sides admit they agreed on as the truly intended rate. Thus, the tender, effective July 18, 1983 to February 19, 1986, shall be reformed such that the rates contained in item 2000 are expressed in terms of cents rather than dollars and cents. This will make the rate conform to the antecedent expressions (in the original page 7 of the tender) the parties agreed to. *See Evans Reamer & Machine Co. v. United States, supra,* 181 Ct.Cl. at 551, 386 F.2d at 880. This means that MTMC was properly billed by Jetco for all the shipments in question. Therefore, plaintiff is not entitled to any recovery on its undercharge claim.

To allow Jetco to charge MTMC at a dollars and cents rate would be to allow the rates to be set by an "egregious blunder" based on a "clear cut clerical error". Reformation is in order to prevent such a

result. *Highway Products, Inc. v. United States*, 208 Ct.Cl. 926, 946, 530 F.2d 911, 922 (1976). "Where words in a contract, if construed literally, would produce an unfair, unusual or improbable result, such construction is to be avoided if possible." *Union Pacific R.R. Co. v. United States*, 152 Ct.Cl. 523, 532, 287 F.2d 593, 598 (1961), quoting *A.E. West Petroleum Co. v. Atchison T. & S.F. Ry. Co.*, 212 F.2d 812, 816 (8th Cir.1954). One can hardly think of a more "unfair, unusual or improbable result" than to allow plaintiff to charge defendant at a rate 100 times greater than what the parties had agreed to.[17]

### D. *Case law distinguished*

In its briefs, plaintiff places such heavy reliance on two cases and expends so many pages on discussions of them that these cases require some comment. The first case is *Hughes Transportation, Inc. v. United States*, 128 Ct.Cl. 221, 121 F.Supp. 212 (1954) (*Hughes I*). *Hughes I* involved a dispute between a carrier and the government shipper over the level of rates to be charged for intrastate shipments. The Court of Claims held that the shipper was entitled to collect from the government at a rate established by the state of Kentucky. This rate was higher than the rates both sides claimed applied. However, before an actual final entry of judgment was entered in the *Hughes I* case the Supreme Court decided *Public Utilities Commission of California, v. United States*, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), *reh'g denied*, 356 U.S. 925, 78 S.Ct. 713, 2 L.Ed.2d 760 (1958). Based on the *Public Utilities* holding the Court of Claims vacated *Hughes I*. *Hughes Transportation, Inc. v. United States*, 144 Ct.Cl. 200, 168 F.Supp. 219 (1956), *cert. denied*, 359 U.S. 968, 79 S.Ct. 879, 3 L.Ed.2d 835 (1959).

Thus, not only is *Hughes I* not a valid precedent, because it was vacated, it is also totally distinguishable from the present case. *Hughes I* involved no section 22 tender, and the shipments were all intrastate.

The other case heavily discussed and cited by plaintiff is *Square D Co. v. Niagara Frontier Tariff Bureau*, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). Plaintiff makes much of the fact that *Square D* upheld the rule laid down in *Keogh v. Chicago & Northwestern R. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The court is hard put to see how this observation has any relevance to the case at hand. *Keogh*, in essence, held that the establishment of ICC tariffs was not a violation of the Sherman Antitrust Act and therefore an action alleging such a "violation" could not be maintained. *Id.* at 162–63, 43 S.Ct. at 49–50. Plaintiff is correct in its assertion that *Square D* reaffirmed *Keogh* but such an observation is simply not germane to the present case. Moreover, while plaintiff may be right that the government exemption (section 22 quotation) from the general rule (filed rate doctrine) should be done away with, the observation in the *Square D* case concerning *stare decisis* reflects the wise policy that in most matters "it is more important that the applicable rule of law be settled than that it be settled right \* \* \*." If there is to be an overruling of the section 22 quotation exemption to the filed rate doctrine, it must come from Congress and not the courts. 106 S.Ct. at 1931.[18]

### *Interest*

▮ Plaintiff also seeks to recover interest. It requests both prejudgment and judgment interest. In its prejudgment in-

---

**17.** Defendant has raised two additional defenses: (1) Jetco failed to satisfy a condition precedent because it did not properly annotate the "Distance Commodity Rates" column in item 2000 when it was changed from per cents to per dollars and cents, and (2) MTMC's agents lacked the authority to bind the government to pay plaintiff at the dollars and cents rate. In view of the disposition of this case, i.e., the tender is reformed so that the cents rate applies to the time period July 18, 1983—February 19, 1986,

the court need not address any of these other defenses and expresses no opinion on them.

**18.** In light of the holding in this case, it is not necessary for the court to enter the thicket raised by the parties as to the authority of the court to remand the reasonableness of the dollars and cents rate in the circumstances of this case to the ICC for a determination.

terest claim, plaintiff seeks recovery of interest on all the principal the GSA withheld from it pursuant to the overcharge claim and the principal amount by which it claims it undercharged MTMC.

As to plaintiff's claim for judgment interest (also known as post judgment interest), only the undercharge principal would be at issue because, as already reported, the overcharge claim has been settled relative to the principal amount.

By arguing that it is entitled to interest, plaintiff must contend with "the ancient doctrine disallowing [recovery of] interest against the government in the absence of *express* statute or contractual provision." *The Singer Co., Librascope Division v. United States,* 215 Ct.Cl. 281, 284, 568 F.2d 695, 698 (1977) (emphasis supplied). *See also Library of Congress v. Shaw,* —— U.S. ——, 106 S.Ct. 2957, 2961–62, 92 L.Ed.2d 250 (1986); *United States ex rel. Angarcia v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 1160, 32 L.Ed. 159 (1888); *Entwistle Co. v. United States,* 6 Cl.Ct. 281 (1984).

■ The United States, in the absence of its consent, is immune from suit. *United States v. Sherwood,* 312 U.S. 584, 587–88, 61 S.Ct. 767, 770–71, 85 L.Ed. 1058 (1941). Waivers of sovereign immunity must be strictly construed. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *United States v. New York Rayon Importing Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 603, 91 L.Ed. 577 (1947). Interest is not recoverable in a suit against the government unless it has expressly provided for its recovery. Thus, a general waiver of sovereign immunity, allowing litigation against the United States, does not automatically effectuate a waiver of sovereign immunity allowing recovery of interest. *Library of Congress v. Shaw, supra,*

106 S.Ct. at 2961. "[I]nterest cannot be recovered unless the award of interest was *affirmatively and separately* contemplated by Congress." *Id.* at 2962 (emphasis supplied).

Admittedly this "no interest" rule puts the government in a "favored position" vis-a-vis claimants. *Library of Congress v. Shaw, supra,* 106 S.Ct. at 2962. It protects the government from claims for interest which would "prevail against private parties." *Id.*

The legal rule that the United States is liable for interest only by express provision is codified at 28 U.S.C. § 2516(a) (1982). *Library of Congress v. Shaw, supra,* 106 S.Ct. at 2963. Plaintiff, acknowledging this legal rule, attempts to come under the umbrella of exceptions thereto through use of a complex collection of statutes and case law. It bases its claim to entitlement to interest on the following theory. Section 2516(a) of title 28 provides that interest on a claim relative to a judgment of the Claims Court rendered against the United States is recoverable only under a contract or express statute. Under 28 U.S.C. § 1961(c)(3) interest is allowed on judgments of the Claims Court as provided in 28 U.S.C. § 1961(c)(1) [19] or as provided in any other "provision of law." According to plaintiff, 49 U.S.C. § 10761 (1982) has been interpreted by courts to permit the recovery of prejudgment interest.[20] Therefore, plaintiff argues, it is entitled to recover interest pursuant to 28 U.S.C. § 2516(a) because that statute's requirement that a statute expressly provide for the payment of interest is satisfied by 28 U.S.C. § 1961(c)(3) which states interest is allowed on a Claims Court judgment as provided by "any provision of law." [21] The "provision

---

**19.** 28 U.S.C. § 1961(c)(1) pertains to tax cases and is not relevant here.

**20.** In making its argument that it is entitled to interest, plaintiff oscillates back and forth as it sometimes refers only to prejudgment interest and other times refers to prejudgment and judgment interest. Given that plaintiff sometimes combines the two, the court assumes that the substance of plaintiff's argument is directed to

its claimed entitlement to both prejudgment and judgment interest. *See* note 22, *infra.*

**21.** Plaintiff describes this phrase—any provision of law—as a "broad catchall" which authorizes recovery of prejudgment and judgment interest. This assertion directly contradicts the rule that waivers of sovereign immunity must be strictly construed. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969).

of law" which supposedly provides for recoupment of interest is the case law which has allowed recovery of interest on a claim based on 49 U.S.C. § 10761.[22]

Plaintiff's argument is fatally flawed in several respects. As mentioned before, if plaintiff refers specifically to a type of interest in its brief it is prejudgment interest. Other times it lumps together both prejudgment and judgment interest. *See* note 20, *supra.* Yet by its very terms 28 U.S.C. § 1961(c)(3) provides that if its requirements are met interest is allowed on Claims Court *judgments.* This section does not authorize the award of prejudgment interest. *See Jarvis v. Johnson,* 668 F.2d 740, 741 n. 1 (3d Cir.1982). Thus the statute which supposedly "expressly provides" for recovery of interest, 28 U.S.C. § 1961(c)(3), applies only to interest on judgments and not on prejudgment interest. Therefore, there is no nexus between 28 U.S.C. § 2516(a) and the case law interpretation of 49 U.S.C. § 10761 holding that prejudgment interest is recoverable under that statute.

Furthermore, the court need not address the merits of whether case law interpretation of 49 U.S.C. § 10761 forms a "provision of law" which would allow for the payment of interest under 28 U.S.C. § 1961(c)(3). Plaintiff's creative argument must be rejected because it has not even demonstrated that courts have interpreted 49 U.S.C. § 10761 as allowing a recovery of interest against the government. Plaintiff has cited only two cases in which the government was a party. Neither of the cases involved 49 U.S.C. § 10761. Indeed, neither of these cases even involved a claim of entitlement to interest pursuant to a statute. *Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244,

81 L.Ed. 360 (1937) involved a taking claim under the Fifth Amendment of the United States Constitution. Although interest was allowed in that case, citation to cases involving Fifth Amendment claims are inapplicable to claims for interest based on a statute. *See Library of Congress v. Shaw, supra,* 106 S.Ct. at 2963 n. 5. *Phelps v. United States,* 274 U.S. 341, 344, 47 S.Ct. 611, 612, 71 L.Ed. 1083 (1927) was "*not* a claim for interest within the purpose or intention of that section [which is currently found at 28 U.S.C. § 2516(a)]." (Emphasis supplied.)

All of the remaining cases cited by plaintiff, and the relevant cases cited within them, which supposedly provide the necessary "provision of law," i.e., an interpretation that 49 U.S.C. § 10761 allows for recovery of interest, involve suits between private parties. Whether or not these cases hold that interest was recoverable against a private party simply is not relevant. As the Supreme Court pointed out in *Shaw,* the government is in a "favored position" which protects it from interest claims that private parties could be liable for. *Id.* 106 S.Ct. at 2962. This observation in *Shaw* also disposes of plaintiff's unsupported conclusory statement at the end of its argument that "the federal government is just as subject to the principal [sic] [that prejudgment interest is recoverable under 49 U.S.C. § 10761] as an individual."

Naturally any claim to post judgment interest must fail. Plaintiff has not recovered a judgment in this action, so there is no judgment on which to base interest.

### Conclusion

For the reasons stated above, the court grants defendant's cross-motion for sum-

---

22. Plaintiff concedes that 49 U.S.C. § 10761 does not "expressly" authorize a recovery of interest. It states that the courts have allowed prejudgment interest where the statute "provides the source of the right or duty claimed for the payment of prejudgment interest." Such a contention is of course in direct opposition to the law set forth above which states that a statute must expressly provide for recovery of interest against the United States. Apparently this is why plaintiff feels it can not argue that the requirements of 28 U.S.C. § 2516(a), i.e., a statute expressly providing for recovery of interest, are satisfied by 49 U.S.C. § 10761. Therefore, it must use 28 U.S.C. § 1961(c)(3), the supposed "expressly providing" statute, as an intermediate step between 28 U.S.C. § 2516(a) and the case law interpretation of 49 U.S.C. 10761.

mary judgment and denies plaintiff's motion for summary judgment, with plaintiff's complaint to be dismissed. No costs.